UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN HILL and MELISSA HILL, on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | 12 C 7240 |
| Plaintiffs, | ) | |
| | ) | Judge Feinerman |
| vs. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., d/b/a WELLS FARGO HOME MORTGAGE, and LPS FIELD SERVICES, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Brian and Melissa Hill brought this lawsuit against Wells Fargo Bank, N.A., and LPS

Field Services, Inc. The amended complaint alleges: (1) violation by LPS only of the Fair Debt

Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.; (2) violation of the Illinois

Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*.; (3)

common law trespass; and (4) invasion of privacy. Doc. 42. The FDCPA and ICFA claims are

brought on behalf of a putative class, while the trespass and privacy claims are not. LPS has

moved to dismiss the FDCPA and ICFA claims under Federal Rule of Civil Procedure 12(b)(6).

Doc. 43. Wells Fargo has moved to strike the amended complaint's class allegations, Doc. 49,

and LPS joined that motion, Doc. 55. LPS's motion to dismiss is granted as to the FDCPA claim

but denied as to the ICFA claim, and the motion to strike the class allegations is granted.

### Background

In considering the motion to dismiss, the court assumes the truth of the amended

complaint's factual allegations, though not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d

630, 632 (7th Cir. 2012). The court must also consider "documents attached to the complaint,

documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in the Hills' brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The following facts are set forth as favorably to the Hills as these materials allow. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

The Hills, a married couple, are the owners of a residential property in Round Lake Beach, Illinois. Doc. 42 at ¶ 4. In 2001, they took out a $76,599 mortgage loan on the property. *Id*. at ¶ 12. For several years, they lived at the property and made their mortgage payments on schedule. *Id*. at ¶ 13. At some point Brian lost his job as a carpenter, and ultimately the Hills' savings ran out and they missed their October 2009 mortgage payment. *Id*. at ¶¶ 14-15.

Wells Fargo is the mortgagee and mortgage servicer on the Hills' property. *Id*. at ¶ 5. In November 2009, Brian called Wells Fargo to request a loan modification in light of the Hills' inability to make the mortgage payments. *Id*. at ¶¶ 16-17. The Hills were given a six-month moratorium, but at the end of that period, when they requested a further modification, Wells Fargo sent them a letter demanding payment in full for the prior six months and threatening foreclosure if they did not pay. *Id*. at ¶¶ 18-20.

On June 7, 2010, Wells Fargo commenced a foreclosure action against the Hills in Illinois state court. *Id*. at ¶ 21. At the initial status hearing on September 17, 2010, the Hills informed the court and Wells Fargo that they intended to keep their home and hoped to resolve the matter. *Id*. at ¶ 25. They filed an answer, indicating their intent to oppose the foreclosure. *Ibid*. At some point, Wells Fargo retained LPS to act as its agent with respect to the mortgage, with instructions to make entries onto the Hills' property and into their home and to board up the home and place bulletins on the property. *Id*. at ¶ 7.

On November 1, 2010, Brian returned home to find that the home had been broken into. *Id.* at ¶ 26. The exterior door's deadbolt and doorknob had been replaced, the hot water tank had been drained through a hole drilled in the tank's floor, faucets had been opened to drain the water lines, the main gas valve had been shut off, and antifreeze had been dumped in the toilet. *Ibid.* The intruders had also rifled through the Hills' personal effects, and some of the Hills' possessions, including tools used by Brian in his work as a carpenter, were missing. *Id.* at ¶ 27. Brian filed a police report, an insurance claim, and, on December 9, 2010, a complaint with the Attorney General of Illinois alleging that Wells Fargo's agents had broken into his home while he was still defending the foreclosure action. *Id.* at ¶¶ 28-29. At a status hearing in the foreclosure case held December 17, 2010, the Hills told the judge about the break-in and theft, and the judge stated that nothing had transpired in the case that would have given Wells Fargo any right to enter the home. *Id.* at ¶ 30.

In the following months, LPS agents retained by Wells Fargo repeatedly visited the Hills' home and posted various stickers and forms on their windows and doors. *Id.* at ¶ 31. The posting on which the Hills focus is attached to the complaint and reads as follows:

*NOTICE*

> LPS Field Services, Inc., inspected this property and found it to be vacant or abandoned. The mortgage holder has the right and duty to protect this property. Accordingly, it is likely that the mortgage holder will have the property secured and/or winterized within the next few days.
>
> Therefore, if this property is <u>NOT VACANT</u>, please call the number below immediately [the posting gives LPS's telephone number].

Doc. 42-3 at 2.

On September 7, 2011, before any judgment of foreclosure had been granted, Brian returned home to find that the locks on the garage door had been changed. Doc. 42 at ¶ 33. The

new lock was not properly installed, and so the home had been left unsecured, which forced the Hills to hire a locksmith to secure the home. *Ibid*. On September 23, 2011, Wells Fargo's agents again entered the Hills' home, without permission from either the Hills or the state court judge; the complaint does not say what the agents did inside the home. *Id*. at ¶ 34. On October 18, 2011, Wells Fargo instructed LPS to continue performing "vacant property svcs" on the home. *Id*. at ¶ 35. On November 15, 2011, Brian's neighbor told him that Wells Fargo's agents had been on the property yet again. *Id*. at ¶ 36. The Hills also received at least four letters from LPS from December 2011 through March 2012 inquiring whether the property had been abandoned. *Id*. at ¶ 37.

The Hills filed the present lawsuit on September 11, 2012. Doc. 1. The amended complaint's class allegations, Doc. 42 at ¶¶ 39-45, are described below in the section addressing Defendants' motion to strike. The court has original jurisdiction over the FDCPA claim under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). As noted above, the FDCPA claim is being dismissed, so the court adds that it also has jurisdiction over the state law claims under the diversity statute, 28 U.S.C. § 1332(a). The Hills are citizens of Illinois. Doc. 84. Wells Fargo is a citizen of South Dakota. Doc. 42 at ¶ 6; *see Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006) ("a national bank … is a citizen of the state in which its main office, as set forth in its articles of association, is located"). LPS is a Delaware corporation with its principal place of business in Florida, making it a citizen of those two States for diversity jurisdiction purposes. Doc. 42 at ¶ 8; *see* 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of every State … by which it has been incorporated and of the State … where it has its principal place of business"). The amount in controversy, at least on the pleadings, exceeds the $75,000 threshold of § 1332(a). Doc. 42 at ¶ 10.

**Discussion**

As indicated above, LPS has moved to dismiss the FDCPA and ICFA claims, while Wells Fargo and LPS have moved to strike the amended complaint's class allegations. Because Defendants have not challenged the trespass and privacy claims, neither of which are putative class claims, those counts need not be addressed in this opinion.

## I.      LPS's Motion to Dismiss

### A.      The FDCPA Claim

LPS's argument for dismissing the FDCPA claim is that most of the underlying events occurred outside the applicable statute of limitations and that the few events that occurred within the limitations period do not suffice to state an FDCPA claim. As the parties recognize, FDCPA claims are subject to a one-year statute of limitations. *See* 15 U.S.C. § 1692k(d) ("An action to enforce any liability created by this subchapter may be brought … within one year from the date on which the violation occurs."); *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730-31 (7th Cir. 2004) (same). Because the Hills filed this lawsuit on September 11, 2012, the question is whether LPS, the sole FDCPA defendant, committed any violations after September 11, 2011. Doc. 42 at ¶ 47 ("This Count is brought on behalf of Plaintiffs and the class for conduct occurring at any time between the one year prior to September 11, 2012 and the date a class is certified.").

The amended complaint alleges that LPS violated § 1692f(6), which provides as follows:

> § 1692f.  Unfair practices
>
> A debt collector may not use unfair on unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> *   *   *
>
> (6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—

5

> (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;
>
> (B) there is no present intention to take possession of the property; or
>
> (C) the property is exempt by law from such dispossession or disablement.

15 U.S.C. § 1692f(6). The parties make several implicit concessions, which operate as forfeitures and narrow the question before the court. First, LPS does not dispute that it is a "debt collector" within the meaning of the FDCPA and therefore that it is subject to § 1692f. Second, LPS does not contend that no predicate to liability under § 1692f(6)—"no present right to possession," "no present intention to take possession," or "the property is exempt by law from such dispossession"—existed. Third, the Hills do not argue that LPS's actions violated any FDCPA provision other than § 1692f(6).

The question the parties contest is whether, in the words of § 1692f(6), LPS took or threatened to take "any nonjudicial action to effect dispossession or disablement" of the Hills' property within the limitations period. The answer is "no." The bulk of the Hills' allegations regarding Defendants' conduct concern conduct that occurred on or before September 7, 2011, and thus outside the limitations period. Doc. 42 at ¶¶ 26-27, 31, 33. And the few acts alleged to have occurred after September 11, 2011, which are the only acts falling within the one-year limitations period, do not suffice to state an FDCPA claim.

First, on September 21, 2011, "Wells Fargo's agents [presumably persons affiliated with LPS] entered the Hills' home … without the [state] court's or the Hills' permission." Doc. 42 at ¶ 34. As LPS concedes, this allegation, if true, would state a trespass claim. But it does not violate § 1692f(6). By contrast to the Hills' allegations of pre-limitations period behavior—such

as replacing the locks on the exterior entry door and the garage door, and drilling a hole in the hot water tank's floor, Doc. 42 at ¶¶ 26, 33—there is no allegation that the LPS agents did anything to prevent the Hills from possessing their home or that the Hills had any difficulty doing so after the September 21 entry, and nor is there any allegation that LPS did anything to disable the home. The Hills note that § 1692f(6) forbids not only actual dispossession but also threats of dispossession and disablement, but the Hills do not and could not explain how breaking into a home constitutes a threat to later take possession of or disable it.

Although the Hills assert that "[u]nauthorized entry into a closed or locked space is sufficient to allege an FDCPA violation," Doc. 59 at 7, they fail to support that assertion with convincing arguments or citations to relevant authority. They rely on *Purkett v. Key Bank USA, Inc.*, 2001 WL 503050 (N.D. Ill. May 10, 2001), but that decision says nothing about whether unauthorized entry can *threaten* dispossession. In *Purkett*, the defendant committed an unauthorized entry into the plaintiff's garage for the purpose of repossessing the plaintiff's car, and the defendant in fact did repossess the car. *Id.* at *2. *Purkett* is about actual dispossession, not threats, and the Hills do not contend that LPS actually dispossessed them of their house by entering it when they were not at home.

Second, "[o]n or about October 18, 2011, Wells Fargo instructed LPS to continue performing 'vacant property svcs' on the Hills' home." Doc. 42 at ¶ 35. Whatever *Wells Fargo* is alleged to have done does not speak to what *LPS* did and, in particular, whether LPS dispossessed the Hills of their property, disabled the property, or threatened to do so. What is relevant is what LPS actually did, not what Wells Fargo (which is not a FDCPA defendant) told LPS to do. The complaint does not allege what, if anything, LPS did in response to the instruction Wells Fargo gave on October 18, 2011.

Third, "Wells Fargo's agents"—again, the court makes the inference, favorable to the Hills, that these were persons affiliated with LPS—trespassed on the Hills' property numerous times within the limitations period, including in June, August, and November of 2012. *Id.* at ¶ 36. As explained above, even an unauthorized entry into the Hills' house is not, without more, a dispossession or disablement or a threat to dispossess or disable. It follows *a fortiori* that trespassing, which encompasses both unauthorized entry into the home and the lesser act of unauthorized entry onto the premises, without more, does not violate § 1692f(6).

Fourth, the Hills received several letters from LPS during the limitations period asking "whether the property is abandoned and whether it is owner or tenant-occupied." Doc. 42 at ¶ 37. A letter inquiring whether anyone is currently in possession of a home, without more, does not come close to a threat to dispossess the possessor. The Hills also allude to the following posting, which was affixed to their property:

*NOTICE*

> LPS Field Services, Inc., inspected this property and found it to be vacant or abandoned. The mortgage holder has the right and duty to protect this property. Accordingly, it is likely that the mortgage holder will have the property secured and/or winterized within the next few days.
>
> Therefore, if this property is <u>NOT VACANT</u>, please call the number below immediately [the posting gives LPS's telephone number].

Doc. 42-3 at 2; *see also* Doc. 42. The Hills refer only to the first of the two paragraphs, but the entire posting was attached to the complaint, Doc. 42-3 at 2, and to the extent that an exhibit attached to the complaint contradicts the complaint's allegations, the exhibit takes precedence. *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). The second paragraph undercuts the Hills' submission that an "unsophisticated consumer" could read the posting as a threat to dispossess them of their property, for it explicitly states that the author

8

believes that the property is vacant and means to act on that belief, but that if the property is not vacant, the possessor should inform the author of that fact. No one could reasonably read the posting to suggest that if the author is informed that the property is not vacant, he still would attempt to kick out the owner. As the Seventh Circuit has explained, "[t]he unsophisticated consumer may be uninformed, naïve, and trusting, but is not a dimwit, has rudimentary knowledge about the financial world, and is capable of making basic logical deductions and inferences." *Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012) (internal quotation marks, brackets, and citation omitted). No person "capable of making basic … inferences" could read the posting to threaten dispossession or disablement.

Accordingly, none of the alleged acts occurring within the limitations period violate § 1692f(6). The Hills object to the court's determining at the pleading stage that the acts occurring outside the limitations period, meaning those occurring before September 11, 2011, are time-barred. As the Hills point out, the Seventh Circuit has held that "because the period of limitations is an affirmative defense it is rarely a good reason to dismiss under Rule 12(b)(6)." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004). But "rarely" is not "never," and the Seventh Circuit has also held that "the statute of limitations may be raised in a motion to dismiss if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense. We find it appropriate here to consider the statute of limitations because the relevant dates are set forth unambiguously in the complaint." *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009). As in *Brooks*, the amended complaint here clearly states the relevant dates; the Hills do not suggest that there is some alleged incident that may or may not have occurred within the limitations period, requiring discovery to determine the precise timeline. All the court needs to know is what the applicable limitations period is, when the

lawsuit was first filed, and whether each of the alleged acts occurred within or outside the limitations period. The court has that information now, and so the court can evaluate on the pleadings LPS's limitations defense to the FDCPA claim.

The Hills suggest that equitable estoppel or equitable tolling might affect the limitations analysis and thereby allow the court to consider acts that occurred before September 11, 2011. In addressing this argument, the court will assume without deciding that those acts did violate § 1692f(6). The Hills submit that, "with full knowledge of the wrongdoing, the trespasses continued for many months thereafter and provide a basis to argue estoppel as to the one-year statute of limitations." Doc. 59 at 8. But equitable estoppel "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations as a defense." *Clarke v. United States*, 703 F.3d 1098, 1101 (7th Cir. 2013) (internal quotation marks omitted). The Hills do not explain how LPS's continued trespasses on their property prevented them from bringing suit earlier, and it is implausible that the trespasses could have had that effect.

Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if *despite all due diligence* he is unable to obtain vital information bearing on the existence of his claim." *Ibid*. (internal quotation marks omitted). The Hills do not suggest that they were unable to obtain facts that showed they had a cause of action against LPS until September 11, 2012. Indeed, the amended complaint's allegations refute any such argument by alleging that the Hills were aware of at least some of LPS's alleged wrongful actions soon after they occurred. Doc. 42 at ¶¶ 26, 33.

The Hills also point out that even acts occurring outside the limitations period may be relevant to whether acts occurring within the limitations period were unlawful. That principle is

correct as a general matter, *see*, *e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (Title VII plaintiffs may use the facts of time-barred violations "as background evidence in support of a timely claim"), but is not applicable here. Viewing the alleged misconduct occurring within the limitations period in light of the alleged pre-limitations conduct does not reveal the within-limitations conduct to have involved dispossession or threat of dispossession.

The Hills are on even weaker ground in invoking the "continuing violation doctrine." Doc. 59 at 8. The Seventh Circuit has held with respect to that doctrine that "[t]he statute of limitations begins to run upon injury … and is not tolled by subsequent injuries" and that "[t]he office of the [continuing violation doctrine] is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." *Limestone Dev. Corp. v. Vill of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008). "It is thus a doctrine not about a continuing, but about a cumulative, violation." *Ibid*. So understood, the doctrine does not render LPS's alleged pre-limitations violations actionable. Those violations had already given rise to "an injury on which [a § 1692f(6)] suit can be brought" at the time they occurred, and to allow an FDCPA claim to proceed on those violations would effectively hold that the statute of limitations on those acts had been tolled by the later wrongs, contrary to the Seventh Circuit's understanding of the doctrine. *See Kovacs v. United States*, 614 F.3d 666, 676 (7th Cir. 2010) ("The continuing violation doctrine … does not apply to a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing.") (internal quotation marks omitted).

Last, the Hills appeal to "the remedial purposes of the FDCPA," Doc. 59 at 8-9, which "imposes strict liability" and whose "terms are to be applied 'in a liberal manner,'" *id*. at 9 (quoting *Buzzell v. Citizens Auto. Fin., Inc.*, 802 F. Supp. 2d 1014, 1023 (D. Minn. 2011)). This

proposition does not get the Hills far, because the one-year limitations period is also part of the

FDCPA and must be enforced to effectuate its own purpose of cutting off claims that challenge

time-barred conduct. *See Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio*, 446 U.S.

478, 487 (1980) (stating that "[s]tatutes of limitations are not simply technicalities" and

explaining the policies behind them at length). That the FDCPA as a whole has a "remedial

purpose" does not justify ignoring its statute of limitations.

For these reasons, the FDCPA claim is dismissed under Rule 12(b)(6).

**B.      The ICFA Claim**

The ICFA is a "regulatory and remedial statute intended to protect consumers, borrowers,

and business persons against fraud, unfair methods of competition, and other unfair and

deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill.

2002). The statute provides redress for deceptive business practices and also for business

practices that, while not deceptive, are unfair. *See ibid.*; *Wigod v. Wells Fargo Bank, N.A.*, 673

F.3d 547, 574-75 (7th Cir. 2012). "The Act is 'liberally construed to effectuate its purpose.'"

*Wigod*, 673 F.3d at 574 (quoting *Robinson*, 775 N.E.2d at 960). The Hills submit that

Defendants' alleged actions were both deceptive and unfair, while LPS contends that they were

neither. The court will consider both prongs of the ICFA, beginning with unfairness. The statute

of limitations applicable to ICFA claims is three years, *see* 815 ILCS 505/10a(e), so none of the

Hills' factual allegations are time-barred and all will be considered.

To determine whether a business practice is unfair, the court considers "(1) whether the

practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous;

[and] (3) whether it causes substantial injury to consumers." *Robinson*, 775 N.E.2d at 961

(citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)). "All three criteria do

not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Ibid.*; *see also Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008). Unfairness under the ICFA "depends on a case-by-case analysis." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). "Because neither fraud nor mistake is an element of unfair conduct under [the ICFA], a cause of action for unfair practices under the [ICFA] need only meet the notice pleading standard of Rule 8(a), not the particularity requirement of Rule 9(b)." *Windy City Metal*, 536 F.3d at 670.

The amended complaint adequately alleges conduct by LPS that is "unfair" within the meaning of the ICFA. In particular, LPS broke into the Hills' home several times, and during some of the break-ins LPS vandalized the home and sought to render it inaccessible to or uninhabitable by the Hills by replacing the locks, draining and wrecking the hot water tank, and dumping antifreeze in the toilet; during at least one break-in, LPS stole some of Brian's personal property, including his carpentry tools. Doc. 42 at ¶¶ 26-27, 33, 34. Drawing all reasonable inferences in the Hills' favor, the court must conclude at this stage that LPS was hoping that its illegal conduct would ultimately drive the Hills out of their home so that Wells Fargo could take possession without having to go through the potentially lengthy foreclosure process mandated by the Illinois Mortgage Foreclosure Law ("IMFL"), 735 ILCS 5/15-1101 *et seq.*

The IMFL provides that "[a]ny person … who harasses or intimidates such occupants [of mortgaged real estate], with the intent of inducing such occupants to abandon the mortgaged premises, in order to obtain a finding of abandonment … shall be guilty of a Class B misdemeanor." 735 ILCS 5/15-1104. The IMFL also states that "[p]rior to the entry of a judgment of foreclosure … [i]n the case of residential real estate, the mortgagor shall be entitled

to possession of the real estate except if" the court decides to give the mortgagee possession for "good cause." 735 ILCS 5/15-1701(b). Because no judgment of foreclosure had been entered and the state court judge had not entered an order giving pre-judgment possession to Wells Fargo, LPS's alleged attempts to drive the Hills to abandon their home so that Wells Fargo could take possession violated the IMFL.

A practice that attempts to circumvent the foreclosure process established by Illinois law is against the public policy of Illinois. *See Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Trust*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011) ("a plaintiff may prove an ICFA unfairness claim by showing that the challenged practice offends public policy," and "a practice can offend public policy if it violates a standard of conduct contained in an existing statute or common law doctrine that typically applies to such a situation") (internal quotation marks and citations omitted) (citing cases); *see also Sperry & Hutchinson Co.*, 405 U.S. at 244 n.5 (in determining whether a practice is "unfair," the FTC considers "whether the practice, without necessarily having been having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness"); *People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d 1378, 1385 (Ill. App. 1991) ("the Illinois legislature has specifically stated that, in construing section 2 of the [ICFA], consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act") (internal quotation marks omitted). The particular tactics allegedly used by LPS were "immoral, unethical, oppressive, or unscrupulous"—in fact, they were all four. LPS's alleged conduct also violated other laws; for instance, LPS itself admits that the Hills have "pled the bare minimum to state a

state law claim for trespass." Doc. 74 at 7. Because LPS's alleged acts violated Illinois statutory and common law, the amended complaint states a viable ICFA unfairness claim. *See Reed v. Farmers Ins. Group*, 720 N.E.2d 1052, 1057 (Ill. 1999) ("The public policy of the state is found in its constitution, its statutes, and its judicial decisions."); *Ekl v. Knecht,* 585 N.E.2d 156, 163 (Ill. App. 1991) (holding that a court addressing an ICFA unfairness claim must consider whether the challenged practice "offends public policy as established by statutes, the common law or otherwise"); *Boyd*, 787 F. Supp. 2d at 752.

The Hills have not pled a viable ICFA deceptive conduct claim. An ICFA deceptive conduct claim requires "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). In addressing deceptiveness, the Hills ignore the break-ins and instead focus on the postings placed on their property: "Defendants' conduct is … deceptive because Wells Fargo's agents' form postings falsely threaten dispossession and/or disablement of property when such conduct must first be approved by the court." Doc. 42 at ¶ 76. But the postings themselves, which are attached to the complaint, Doc. 42-3, and quoted above, refute that characterization. Again, the postings say:

*NOTICE*

LPS Field Services, Inc., inspected this property and found it to be vacant or abandoned. The mortgage holder has the right and duty to protect this property. Accordingly, it is likely that the mortgage holder will have the property secured and/or winterized within the next few days.

Therefore, if this property is <u>NOT VACANT</u>, please call the number below immediately [the posting gives LPS's telephone number].

Doc. 42-3 at 2. The Hills focus on this portion of the posting: "it is likely that the mortgage holder will have the property secured and/or winterized within the next few days," which they construe as a deceptive threat to dispossess them. Doc. 59 at 14. But read in context, it is clear that "secur[ing]" the property is intended as a response to the posting's supposition that the property is "vacant or abandoned." And the final sentence of the posting makes clear that the supposition can be corrected—that the owner can stop LPS from securing the property by calling and informing it that the property is not vacant. In their brief opposing dismissal, the Hills do not even acknowledge the final sentence of the posting, much less attempt to explain how it is consistent with their view that the posting was deceptive. The postings may have been annoying, but they could not be said to have conveyed the impression that LPS meant to "secure" the property even if the Hills continued to live there—an impression, had it actually been conveyed, that would have been "deceptive" because Illinois law in fact barred LPS from taking the property while the Hills remained in possession.

The Hills contend that LPS's "postings are in direct contravention of the form mortgage foreclosure notices, which advised the Hills and the class members that, 'The lawful occupants of a home have the right to live in the home until a judge enters an order for possession.'" Doc. 59 at 14. But read in full, the postings did not conflict with the foreclosure notices. To the contrary, the postings acknowledged that LPS would not secure the home if it was informed that its belief that the home had been abandoned was incorrect, and it listed a phone number for the occupants to call if they had not abandoned the home. At the motion to dismiss stage, the court must draw all reasonable inferences in favor of the Hills, and so it infers that LPS did not have a good faith belief that the Hills had actually abandoned their home, but instead asserted that belief as a pretext for taking possession of the property without first obtaining the state court's

permission. So understood, the postings may have been obnoxious and harassing, but they were not deceptive. LPS plainly did not intend that the Hills rely on its representation that it believed the home was abandoned, for the postings acknowledged the possibility that the home was not abandoned and gave the Hills a way to inform LPS of that fact.

That the Hills had a legal right to remain in possession absent a court order to the contrary says nothing about what should happen if, as LPS purported to believe, the Hills had voluntarily decided to abandon their property. The Hills do not suggest, for instance, that even if they had abandoned the property, LPS could not lawfully secure it without first getting a court order; by failing to make such an argument, they have forfeited it. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[w]e apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue"); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and … perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (brackets and internal quotation marks omitted).

To summarize, for purposes of their ICFA claim, the Hills have failed to allege that Defendants engaged in deceptive practices, but they have successfully alleged that they engaged in unfair practices. Because the statute is phrased in the disjunctive, the Hills may proceed with their unfair conduct claim despite the absence of deceptive conduct. *See Pappas v. Pella Corp.*, 844 N.E.2d 995, 1002-03 (Ill. App. 2006). Accordingly, LPS's motion to dismiss Count II is denied, though the Hills cannot proceed with their ICFA claim on a deceptive practices theory.

## II.     Defendants' Motion to Strike Class Allegations

Defendants ask the court to reject the Hills' putative class action by striking the amended complaint's class allegations.  The FDCPA claim has been dismissed and the ICFA claim cannot proceed on a deceptive conduct theory, so the court need consider only whether an ICFA unfair conduct class can proceed.  Because the amended complaint's class allegations preclude certification of the putative ICFA unfair conduct class, the motion to strike is granted.

As a threshold matter, the Hills contend that no procedural mechanism empowers the court to decide at the pleading stage whether the suit will be permitted to proceed as a class action.  Doc. 60 at 4-8.  The Hills are incorrect.  Rule 23(c)(1)(A) states that "[a]t an early practicable time after a person sues … as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A).  The rule's text plainly indicates that the court may decide to reject a plaintiff's attempt to represent a class as soon as it becomes obvious that the plaintiff will be unable to satisfy Rule 23.  Most often it will not be "practicable" for the court to do that at the pleading stage, but sometimes the complaint will make it clear that class certification is inappropriate.  The Supreme Court has recognized as much: "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).  This is a case where "the issues are plain enough from the pleadings" to allow the court to conclude that no class can be certified.

*Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011), supports the view that rejecting class certification at the pleading stage is proper.  The defendant in *Pilgrim* moved

to strike the complaint's class allegations, and the district court granted the motion. *Id*. at 945.

On appeal, the plaintiffs contended that the district court had jumped the gun by ruling on class

certification early on, when the plaintiffs still hoped to strengthen their case for certification

through discovery. The Sixth Circuit disagreed:

> The plaintiffs' other objection to the district court's class-action ruling goes to the timing, not the substance, of it. Given more time and more discovery, they say, they would have been able to poke holes in the court's class-certification analysis. We think not.

> That the motion to strike came before the plaintiffs had filed a motion to certify the class does not by itself make the court's decision reversibly premature. Rule 23(c)(1)(A) says that the district court should decide whether to certify a class "[a]t an early practicable time" in the litigation, and nothing in the rules says that the court must await a motion by the plaintiffs. As a result, "[e]ither plaintiff or defendant may move for a determination of whether the action may be certified under Rule 23(c)(1)." 7AA Charles [Alan] Wright et al., *Federal Practice and Procedure* § 1785; *see also, e.g.*, *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 941-44 (9th Cir. 2009); *Cook County College Teachers Union, Local 1600 v. Byrd*, 456 F.2d 882, 884-85 (7th Cir. 1972).

> To say that a defendant may freely move for resolution of the class-certification question whenever it wishes does not free the district court from the duty of engaging in a "rigorous analysis" of the question, and "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 160 (1982). The problem for the plaintiffs is that we cannot see how discovery or for that matter more time would have helped them. To this day, they do not explain what type of discovery or what type of factual development would alter the central defect in this class claim. The key reality remains: Their claims are governed by different States' laws, a largely legal determination, and no proffered or potential factual development offers any hope of altering that conclusion, one that generally will preclude class certification.

*Id*. at 949 (first two alterations in original).

The Seventh Circuit case cited by *Pilgrim*, *Cook County College Teachers Union, Local*

*1600 v. Byrd*, *supra*, held, citing Rule 23(c), that "[o]ne opposing a class action may move for an

order determining that the action may not be maintained as a class suit." 456 F.2d at 885. And

more recently, in *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557 (7th Cir. 2011), the Seventh

Circuit cited Rule 23(c)(1)(A) for the propositions that "a court may deny class certification even

before the plaintiff files a motion requesting certification" and that a court "need not delay a

ruling on certification if it thinks that additional discovery would not be useful in resolving the

class determination." *Id*. at 563. Given this, and given that the court would find *Pilgrim*

persuasive even if *Cook County Teachers Union* and *Kasalo* were not on the books, the court

holds that a ruling on class certification is appropriate at the pleading stage where, as here, the

pleadings make clear that the suit cannot satisfy Rule 23. *See* Joseph M. McLaughlin,

*McLaughlin on Class Actions* § 3:4 (2012) ("courts have held that motions to strike should not be

the norm, but are appropriate when the unsuitability of class treatment is evident on the face of

the complaint").

The amended complaint defines the proposed class as "all persons in the State of Illinois

to whom: (a) Defendants and their agents threatened to take or did take non-judicial action to

effectuate the non-judicial dispossession or disablement of homes prior to the entry of any court

order which: (i) determined the property had been abandoned; or (ii) ordered possession or a

judgment of foreclosure, sale, and confirmation of sale pursuant to 735 ILCS 5/15-1508." Doc.

42 at ¶ 39. Defendants assert many bases for striking the class allegations, but one is dispositive:

The proposed class cannot satisfy the predominance requirement of Rule 23(b)(3). And since

Rule 23(b)(3) is the only route to class certification that the Hills invoke, Doc. 60 at 16 ("A case

need only satisfy one element of Rule 23(b), and the Hills anticipate that they will seek to certify

the class under Rule 23(b)(3)."), the class's inability to meet its requirements is fatal to the

proposed class, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011) ("the proposed

class must satisfy at least one of the three requirements listed in Rule 23(b)").

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Seventh Circuit has explained the predominance requirement as follows:

> Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and … can be resolved for all members of a class in a single adjudication. Or, to put it another way, common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class. If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question. Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole.

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (citations, brackets, and internal quotation marks omitted). "Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Ibid.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011)). Again, having dismissed the FDCPA claim and having held that the Hills failed to adequately allege an ICFA deceptive business practices claim, the court will focus on the elements of an ICFA unfair practices claim. To determine whether a business practice is unfair, the court considers "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Robinson*, 775 N.E.2d at 960.

The amended complaint makes clear that the questions of law or fact common to the members of the putative class are few, while questions that must be resolved independently for

each class member predominate. The Hills assert that the following questions of fact and law are

common to the members of the proposed class:

> a. Whether Defendants' practices of boarding up, changing locks, and entering into homes without [a] hearing or a court order violates statutory and common law;

> b. Whether Defendants' pre-judgment dispossession constitutes unfair and deceptive business practices and unlawful trespass;

> c. Whether Defendants' form notices … falsely, deceptively or unfairly state a consumer's obligations and a mortgagee's rights in contravention of the Illinois Mortgage Foreclosure Law; and

> d. Whether Defendant LPS violated § 1692f(6) [of] the FDCPA.

Doc. 42 at ¶ 42. Questions (c) and (d) are easily disposed of, for the court has just held that the

materials posted on the Hills' property did not violate the ICFA and that the Hills have failed to

state a § 1692f(6) claim. Question (b) must be rejected on the same ground, for the Hills have

not pled that Defendants actually dispossessed them of their property; they have pled only that

Defendants *attempted* to dispossess them by taking certain actions while the Hills were away

from home, but that they were able to return to their home after each break-in. Moreover, as

shown above, the Hills have not adequately pled deceptive practices.

To give the Hills the benefit of the doubt, suppose that Question (b) were edited to ask

whether Defendants' *attempts* at pre-judgment dispossession constitute unfair business practices

and unlawful trespass, and then combine that new version of Question (b) with Question (a),

which asks whether Defendants' practices of boarding up, changing locks, and entering into

homes without a hearing or a court order violates statutory and common law. Those questions

are indeed presented by the Hills' case and may be common to at least some other class

members—"some" because the class definition's reference to "non-judicial action to effectuate

the non-judicial dispossession of homes" sweeps in homeowners who allegedly were subjected

to other forms of non-judicial misbehavior. But those two questions could not possibly *predominate* under Rule 23(b)(3). Those "questions" are little more than abstract legal definitions; it is obvious that the acts described, when performed by a person with no right to possession, are unlawful. The court has held above that they are unfair practices under the ICFA when intended to drive homeowners out of rightful possession of their property, and plainly breaking into a home without legal authorization constitutes "unlawful trespass." *See Burns Philp Food, Inc. v. Cavalea Continental Freight, Inc.*, 135 F.3d 526, 529 (7th Cir. 1998) (under Illinois law, "[t]respass is entry without consent"); 720 ILCS 5/19-4(a)(1) ("A person commits criminal trespass to a residence when, without authority, he or she knowingly enters or remains within any residence, including a house trailer that is the dwelling place of another.").

These questions cannot predominate because the lawsuit presents a slew of legal and factual questions that are unique to each class member. With respect to each class member the following questions are presented: What actions did Defendants take against that particular class member? Did they change his locks, board up his doors or windows, or do something else like vandalizing his hot water tank, or did they merely enter his home without doing anything in particular inside it, or merely trespass on his land without entering any structure? When did each act take place, and which occurred within the applicable statute of limitations? Do the particular actions amount to an attempt to drive the class member out of his home (as was the case with the Hills), or do they in some other way constitute unfair practices under the ICFA? Did Defendants have a court order entitling them to dispossess the class member?

As mentioned above, unfairness under the ICFA "depends on a case-by-case analysis," *Siegel*, 612 F.3d at 935, and this case is no exception. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from

member to member, then it is an individual question." *Messner*, 669 F.3d at 815. The principal questions to be resolved for each class member would be such individual questions. Each question must be answered individually for every member of the ICFA class, and while the final question just noted—which requires a search of the record of any foreclosure proceedings involving that class member—may not be especially onerous, the others would be. And those questions, which ask what Defendants did to a given class member and whether it was unfair under the applicable legal standard, are the core of the liability case; they are the questions that predominate, and because they are individual rather than class questions, they preclude the proposed class from meeting Rule 23(b)(3)'s predominance requirement. *See Siegel*, 612 F.3d at 935-36 (affirming district court's denial of class certification of an ICFA unfairness claim because "questions of fact common to class members did not predominate over any questions affecting only individual members," as required by Rule 23(b)(3)); *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 382-84 (S.D. Ill. 2008) (same).

The Hills respond that "the work orders from Wells Fargo to LPS will prove that Wells Fargo directed LPS to secure the homes, and LPS's reports back to Wells Fargo will confirm it did so." Doc. 60 at 17. But what actually and specifically happened to each class member still presents individual, fact-bound questions that turn on any available communications between Defendants as well as other evidence, including testimony from the relevant class member and the relevant employees of Defendants. The jury's determination of whether the Hills suffered an ICFA unfair conduct violation will not determine, one way or the other, whether any other putative class member also suffered an ICFA unfair conduct violation. And so it is inconceivable that any evidence exists that would avoid the necessity of conducting individual liability proceedings for each class member, with evidence unique to that class member. That

means that individual questions predominate, and accordingly that class certification would be inappropriate.

## Conclusion

For the foregoing reasons, LPS's motion to dismiss is granted with respect to the FDCPA claim and denied as to the ICFA claim, though the ICFA claim cannot proceed on a deceptive practices theory. Defendants' motion to strike the class allegations is granted. The ICFA unfairness claim may proceed on behalf of the Hills, though not as a class claim. The trespass and privacy claims may proceed as well.

The dismissal of the FDCPA claim on limitations grounds, and the holding that the amended complaint does not state an ICFA deceptive practices claim, are without prejudice to repleading. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity, at least upon request, to amend the complaint to correct the problem if possible."); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("As a general matter, Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading."). Ordinarily, a dismissal on limitations grounds is with prejudice because a limitations problem cannot be cured by repleading. *See Rosenfield v. HSBC Bank, USA,* 681 F.3d 1172, 1189-90 (10th Cir. 2012) (affirming the district court's rejection of the plaintiff's request for leave to amend where the amendment would have been futile because the claims were untimely); *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 353 (2d Cir. 1993) (same). But because it is possible, albeit highly unlikely, that the Hills did not plead everything relevant to § 1692f(6) that occurred during the one-year FDCPA limitations period, the court will give the Hills one final opportunity to do so. And because the contours of the Hills' FDCPA and ICFA claims have

not yet been set, the striking of the class allegations is without prejudice as well. The Hills have

until June 14, 2013, to replead those aspects of their case.


May 24, 2013                                   _____
                                               United States District Judge