**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRIAN HILL and MELISSA HILL and, | ) | |
| ANTHONY DUGO and TAMMY DUGO, | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 12 C 7240 |
| | ) | |
| v. | ) | Judge Feinerman |
| | ) | Magistrate Judge Valdez |
| WELLS FARGO BANK, N.A., d/b/a | ) | |
| WELLS FARGO HOME MORTGAGE, | ) | |
| and LPS FIELD SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | JURY DEMANDED |

**<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**

1.     Plaintiffs Brian and Melissa Hill seek relief against Defendants Wells Fargo

Bank, N.A, d/b/a Wells Fargo Home Mortgage ("Wells Fargo") and LPS Field Services, Inc.

("LPS"), on behalf of themselves and all similarly-situated individuals.

2.     Plaintiffs Anthony and Tammy Dugo were members of the proposed class alleged

in the Hills' first amended complaint: "all persons in the State of Illinois to whom: (a)

Defendants and their agents threatened to take or did take non-judicial action to effectuate the

non-judicial dispossession or disablement of homes prior to the entry of any court order which:

(i) determined the property had been abandoned; or (ii) ordered possession or a judgment of

foreclosure, sale, and confirmation of sale pursuant to 735 ILCS 5/15-1508."  Doc. 42 at ¶ 39.

3.     The Dugos join the Hills in their request for relief against Wells Fargo and LPS,

seeking to be representatives of the proposed classes, which have been more fully outlined and

supported herein with facts obtained in discovery and through other means subsequent to the

filing of Defendants' motions against the first amended complaint.

## PARTIES

4.      Plaintiffs Brian Hill and Melissa Hill are a married couple who at all times relevant own the property located at 1019 Barberry Lane, Round Lake Beach, Illinois 60073.

5.      Plaintiff Brian Hill is an Illinois citizen because his domicile is the State of Illinois.  He resides in this district.

6.      Plaintiff Melissa Hill is an Illinois citizen because her domicile is the State of Illinois.  She resides in this district.

7.      Plaintiff Anthony Dugo and Tammy Dugo are a married couple who at all times relevant owned the property located at 436 Flint Trail, Carol Stream, Illinois 60188.

8.      Plaintiff Anthony Dugo is an Illinois citizen because his domicile is the State of Illinois.  He resides in this district.

9.      Plaintiff Tammy Dugo is an Illinois citizen because her domicile is the State of Illinois.  She resides in this district.

10.     Defendant Wells Fargo Bank, N.A. is at all times relevant the mortgagee and servicer of the property located at 1019 Barberry Lane, Round Lake Beach, Illinois 60073.

11.     Defendant Wells Fargo Bank, N.A. was at all times relevant the mortgagee and servicer of the property located at 436 Flint Trail, Carol Stream, Illinois 60188.

12.     On information and belief, Wells Fargo is a citizen of South Dakota and engages in banking and mortgage lending services throughout this district and has subjected itself to the laws of the State of Illinois.

13.     Wells Fargo retained Defendant LPS Field Services, Inc. and together the Defendants jointly designed, approved, and executed a process and procedure to effectuate dispossession and/or disablement of the Plaintiffs' homes.  The process entailed: a) surveilling

2

the homes, aided by affixing vacant property notices that falsely represented/implied the

Defendants had the right to imminently effect dispossession and/or disablement of the Plaintiffs'

homes by securing and/or winterizing the homes; b) making forced entries into Plaintiffs' homes;

c) searching the interior of Plaintiffs' homes and any personal property therein; d) photographing

the interior of Plaintiffs' homes and any personal property therein; and e) boarding up and/or

winterizing the Plaintiffs' homes.

14.     LPS describes itself as a "national leader" in field services and offers

"comprehensive preservation services" such as lock changes and board-ups.

15.     LPS is a Delaware corporation, headquartered in Florida, with a registered agent

located in this district.  LPS has subjected itself to the laws of the State of Illinois.

## JURISDICTION AND VENUE

16.     Federal question jurisdiction exists pursuant to 28 U.S.C. § 1331 because

Plaintiffs' and the class members' claims arise under the Fair Debt Collection Practices Act

("FDCPA"), 15 U.S.C. § 1692 *et seq*.  The FDCPA claims against LPS arise from the following

conduct:

> A.     As an integral component of LPS's process, practice and procedure for
> effectuating the dispossession and/or disablement of Illinois mortgagors'
> interests in real property, and thus aid in the transfer of possession to
> Wells Fargo, LPS unlawfully affixed form vacant property notices to the
> Plaintiffs' property that falsely threatened the possibility of imminent
> dispossession/disablement of their homes unless they called LPS within a
> few days, even though a homeowner has no legal obligation to respond to
> the threat, let alone call LPS, to avoid dispossession/disablement because
> the Defendants cannot act to effect dispossession/disablement until Wells
> Fargo takes the very simple but crucial step of noticing a motion for
> possession before the court in the already pending foreclosure action.
> Further, the act of affixing a notice which publicly declares that a house is
> vacant in and of itself is an act which is used to effect dispossession by
> harassing the property owner and unfairly subjecting the property to a
> greater risk for criminal actions;

3

B.  As an integral component of LPS's process, practice and procedure for effectuating the dispossession and/or disablement of Illinois mortgagors' interests in real property, LPS forced entry into Plaintiffs' homes without judicial permission, even though the entries were unlawful and constituted a breach of the peace under Illinois law;

C.  As an integral component of LPS's process, practice and procedure for effectuating the dispossession and/or disablement of Illinois mortgagors' interests in real property, LPS utilized its standard practice and procedure of cataloging, photographing, and inspecting the interior contents of Plaintiffs' homes without judicial permission and when such conduct is unlawful;

D.  As an integral component of LPS's process, practice and procedure for effectuating the dispossession and/or disablement of Illinois mortgagors' interests in real property, LPS utilized its standard practice and procedure of changing the locks and winterizing Plaintiffs' homes without judicial permission and when such conduct is unlawful.

17.  Further, diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a) and/or (d) because: (a) Plaintiffs and Defendants are citizens of different states and the individual matter in controversy between them exceeds $75,000, exclusive of interests and costs; and/or (b) this case is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and at least one member of the proposed class is a citizen of a state different from all Defendants.

18.  Supplemental jurisdiction over the state law claims exists under 28 U.S.C. § 1367(a).

19.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the acts and transactions that give rise to this action occurred, in substantial part, in this district.  Venue is also proper since Defendants have agents and transact business in this district.

## THE RELATIONSHIP BETWEEN WELLS FARGO AND LPS

20.  Wells Fargo retained co-Defendant LPS and together they jointly designed, approved and executed a process and procedure to illegally effectuate the dispossession and/or

4

disablement of the Plaintiffs' and other Illinois property owners' homes.  Further, Wells Fargo

retained co-Defendant LPS as its agent to effectuate this process.

21.     As set forth in his article entitled "The New Normal for Field Services Industry"

Jerry Rowell, Managing Director of LPS Field Services states in relevant part:

> "the regulatory landscape has permanently changed to one of dramatically increased oversight of the mortgage industry, and mortgage servicers must take an aggressive approach to compliance management. This starts with servicers working to codify their business rules, processes, and procedures so their field service partners can execute their duties in conjunction with their servicer clients' expectations and risk tolerance.  With the potential for stiff regulatory penalties and reputational damage associated with non-compliance, servicers must make clear their servicing expectations, so nothing material is left to interpretation."

22.     Each of the Defendants' specific roles relating to the conduct complained of

herein is within the specific knowledge and control of the Defendants.  Thus far, the Defendants

have not provided this information in response to discovery and as a result, only further and

more complete discovery obtained from the Defendants will reveal the actual capacity in which

each Defendant (or all Defendants) is/are responsible for the complained of conduct.

23.     Wells Fargo and LPS are liable for the complained of conduct based upon the acts

of their representatives and co-Defendant acting at their specific direction and/or for their mutual

benefit to take or threaten to take nonjudicial action to effect dispossession or disablement of

property, when the actions or threats of such actions are exempt by law from such dispossession

or disablement under the Illinois Mortgage Foreclosure Law ("IMFL"), 735 ILCS 5/15-1101 *et

seq.*

24.     Wells Fargo and LPS are also liable for the complained of conduct for failing to

adequately supervise and/or monitor the activities of those it enlists to carry out actions or threats

to take action in furtherance of nonjudicial acts to effect dispossession or disablement of property

Wells Fargo is also liable for the actions of LPS and its subcontractors because the activities

described herein, *e.g.*, breaking into occupied homes, are inherently dangerous activities and thus create non-delegable duties.

### LPS'S ACTIONS, TAKEN IN FURTHERANCE OF THE DISPOSSESSION OR DISABLEMENT OF PROPERTY

25.     LPS's core business purpose is to provide "preservation" services, or the securing and winterization of properties for lenders such as Wells Fargo.  It claims to be "one of the nation's oldest field service companies" and "an innovator in the mortgage field service industry since 1968."  LPS states that "we inspect, report, and perform property preservation and REO services on mortgaged properties" for mortgage companies, banks, savings and loans, and insurance companies.

26.     In Illinois, a lender's right to dispossess/disable property owners of their right to their real property is governed by the IMFL.

27.     Foreclosure actions in Illinois are governed by the IMFL.  Section 15-1701(b) of the IMFL explains that homeowners are entitled to possession of their properties unless and until: "(i) the mortgagee shall object and show good cause; (ii) the mortgagee is so authorized by the terms of the mortgage or other written instrument, and (iii) the court is satisfied that there is a reasonable probability that the mortgagee will prevail on a final hearing of the cause …"

28.     LPS publicly admits that any right of the lender to protect a property does not supersede state possession laws, such as those embodied in the IMFL:



29.     Despite LPS's public acknowledgement, LPS's non-judicial practices and procedures to secure and/or winterize Illinois properties for Wells Fargo, taken in furtherance of

the goal of ultimately putting Wells Fargo in possession, are unlawful under Illinois' law. These non-judicial practices and procedures are unlawful simply because Defendants failed to take the necessary but simple step of filing a motion with the state court in the pending foreclosure action to obtain leave to enter, secure, photograph, catalogue, and/or winterize the Plaintiffs' and the proposed class members' homes.

30.     LPS's process, and each component of the process, constitutes overt nonjudicial actions taken on behalf of Wells Fargo to effectuate the dispossession and/or disablement of Illinois homeowners' property.

31.     LPS's "General Default Timeline" partially illustrates the process LPS utilizes to effectuate nonjudicial dispossession and/or disablement of homeowners' rights in their property:



32.     The first component of LPS's process and procedure to effectuate disablement/dispossession is to physically affix the following notice to the Illinois home:



33.    LPS's training materials explain in detail the uniform method by which each of its subcontractors are to affix these notices to the home:



34.    The notice is false, deceptive, and unfair in that:

A.    The mortgage holder cannot have the property secured and/or winterized "within the next few days" because prior to taking that action (in a legal manner) there is the necessary, but simple step, of noticing up a motion before the state court in the pending foreclosure action. *See* 735 ILCS 5/15-1706 ("A request that the mortgagee be placed in possession or that a receiver be appointed may be made by motion.") Noticing the motion, presenting it, allowing time for any response, getting it granted, and then acting on the resulting order takes more than a few days. Thus, the motion would, like a routine motion to appoint a special process server, simply state under oath that Wells believes the property to be abandoned.

B.    Demanding that the consumer call "the number below immediately" to avoid action being taken to dispossess/disable their home falsely implies that the consumer is legally obligated to act by calling LPS or suffer dire consequences when there is no such legal obligation to avoid dispossession/disablement of the property.

8

C. Demanding by means of a threat (a false threat) that calling "the number below immediately" will spare the consumer from action being taken to dispossess/disable their home is deceptive in that it does not stop LPS from taking the next steps in its process and procedure to secure or winterize properties. ██████████████████████████████████████

██████████████████████████████████████████████████████

35. LPS's action of affixing the vacancy notice is also unlawful because: (a) it constitutes trespass under 720 ILCS 5/21-3 and criminal defacement of property under 720 ILCS 5/21-1.3; (b) it could lead to a breach of the peace due to the risk associated with a homeowner returning and encountering an LPS agent or invite neighborhood break-ins; and (c) it is prohibited by HUD Regulations because, for example, "6. Unless required by Regional guidelines, mortgagees must not post signs or take other actions that might call attention to the fact that the property is vacant. Some local HUD Offices may require that signs be posted, but these will normally be restricted to areas where boarding of openings is deemed necessary and to properties that have been boarded."

36. In conjunction with its false, threatening and illegal vacancy postings, LPS regularly and repeatedly sends Illinois homeowners a form letter asking them to confirm the occupancy status of their properties. The form does not contain imminent threats of dispossession/disablement of the property and therefore contradicts the posted notice causing further confusion:

```
Dear Resident:

We have been requested to contact you by the above company in order
to verify that the property at this address is occupied. Please
inform  us  of  the  property  occupancy  status  by  checking  the
appropriate box below:

        [ ] Occupied by owner      Name: _____

        [ ] Occupied by tenant     Name: _____


Please return this letter to:

            OVL Program
            LPS Field Services
            30825 Aurora Road, Suite 140
            Solon, OH 44139
```

37.     Tellingly, these form letters demonstrate that the vacancy notices are superfluous and are not being used for any legitimate purpose. Rather, the fact that vacancy information can be obtained by a call or mere letter demonstrates that the real purpose for illegally affixing vacancy notices in a publicly viewable location is to harass and embarrass the homeowner, and subject them to a heightened risk for criminal conduct (by announcing to all passersby that the home is "vacant"), as part of LPS's process and procedure to effectuate dispossession or disablement of the property.

38.     Also tellingly, LPS continues its efforts to secure (dispossess/disable) the properties even after a homeowner reports that the home remains occupied because the next component of LPS's process, practice and procedure to dispossess/disable is to gain entry into the interior of the home.  *See* the following outline for interior inspections:



39.     Entry into a person's home pursuant to a security interest is specifically prohibited by 735 ILCS 5/9-101 which states, "No person shall make an entry into lands or tenements except in cases where entry is allowing by law," in this case, a court order in the pending foreclosure proceeding.

40.     LPS recognizes that unauthorized entry into a person's home is an inherently dangerous action which subjects the occupants of the home, as well as LPS's own agents, to risk for grave bodily harm or death.

41.     LPS trains its agents to prepare for the risk of grave bodily harm or death (for example, in the event a homeowner unexpectedly finds an LPS agent in the home), in accordance with the Federal Law Enforcement Training Center.  *See* LPS training materials, in relevant part:







42.     However, and despite its acknowledgement of the grave risk of breaking into homes, LPS still stresses to its agents that to get paid, they must ensure entry by almost any

means. LPS's "best practices" succinctly encapsulates this sentiment as follows: "Access Denied provides no revenue":



43.     In its contractors' manual, LPS also provides "tips" for its agents to use to forcibly gain entry to a home. These tips include the same techniques burglars use, such as by "lock-picking" and forced window access:

44.     Once LPS's agents successfully gain entry to the home, LPS requires the home

13

and the personal, private possessions of the owner to be catalogued. Agents are instructed to examine and document the contents of the homes entered, take photographs, and rummage through homeowners' personal property. *See, e.g.*, LPS's exemplar photos of the Hills' property, taken after the medicine cabinet and clothes closet were opened and examined:

 

45.     LPS explains that these photographs are necessary to justify taking the homeowners' personal property out of the home (even though that act constitutes conversion, more commonly known as theft):

 

46.     After the home is catalogued, LPS changes the locks, removes the property located within the home, and performs "winterization" services, such as water shut-offs and plumbing adjustments.

47.     On information and belief, despite the fact that HUD guidelines state that lockbox codes should be random and not published, LPS actually uses uniform key codes for the

properties it "secures" and it publishes these codes in an unencrypted and publicly accessible

location on the Internet:



48. Defendants admit and acknowledge that Illinois is a "must evict personal property

state," but Defendants do not act in accordance with this knowledge.

49. LPS describes, in part, its "pre-sale preservation eviction efforts" as follows:



50.     Threats to secure property, change locks, and winterize can cause irreparable injury to a homeowner, even if the locks are not changed and the property is not actually winterized, especially where the threats are in violation of state law requiring a judge's order to accomplish such tasks.

51.     The language contained in the LPS vacancy notice is a threat of illegal action.  In fact, since the inception of this case, at least one court has found that a posted notice containing virtually the identical language constitutes an impermissible threat to change the locks, winterize the property, or threatening to enter the residential property.  *See Regions Bank v. Paul Roberts*, Case No. 10-000191-CI-11.

## FACTS SPECIFIC TO PLAINTIFFS

### Brian and Melissa Hill

52.     On September 24, 2001, the Hills executed a mortgage and note with Washington Mutual Bank, FA for the property located at 1019 Barberry Lane, Round Lake Beach, Illinois 60073, for the principal sum of $76,599.00.

53.     The Hills lived at the property with their young daughter and made their mortgage payments for several years.

54.     However, Brian Hill lost his job as a union carpenter.  To try and make ends meet, Melissa Hill (formerly a stay-at-home mother) found work, but it paid less than her husband's former job.  When the Hills' savings and carpenters' annuity ran out, even with Melissa's salary, the Plaintiffs struggled with putting food on their table and making their monthly mortgage payments.

55.     As a result of their hardship, the Hills missed their October 2009 mortgage payment.

56.     On or about November 1, 2009, Brian Hill called their mortgage servicer, Wells Fargo, and asked for a loan modification and to be considered for different work-out options.

57.     During the call, Brian Hill gave Wells Fargo financial information over the phone (specifically, a list of his family's monthly income sources and monthly expenses) so that Plaintiffs could be considered for a loan modification or other work-out option.

58.     Wells Fargo represented to the Hills that they were eligible for a "6 month moratorium" or words to that effect, and led Mr. Hill to believe that the 6 months of deferred payments would be added on to the end of the loan term.

59.     In April of 2010, prior to the termination of the 6 month deferral period, Brian Hill spoke with Wells Fargo and again asked to be considered for a loan modification or other assistance to save his family home.

60.     Instead of helping, Wells Fargo sent a letter demanding payment in full of the prior 6 months of deferred mortgage payments and threatening foreclosure.

61.     On June 7, 2010, Wells Fargo filed a complaint to foreclose against the Hills in the Circuit Court of Lake County, Case No. 10 CH 3212.  The complaint stated, "Plaintiff seeks to terminate the right to possess the mortgaged real estate after confirmation of a foreclosure sale against all defendants who have the right to possess the property."

62.     Attached to the summons and complaint was Wells Fargo's "IMPORTANT INFORMATION FOR HOMEOWNERS IN FORECLOSURE."  As required by Illinois law, Defendant's notice stated, among other things: "1. POSSESSION: The lawful occupants of a home have the right to live in the home until a judge enters an order for possession.  2. OWNERSHIP: You continued to own your home until the court rules otherwise."  735 ILCS 5/15-1504.5.

63.     Prior to being served with the complaint, on June 14, 2010, Brian Hill wrote to Wells Fargo's Loss Mitigation Department and explained he still wanted to try and save his home.

64.     But on June 24, 2010, the Hills were served with the complaint.

65.     The Hills appeared at the first court status hearing in the foreclosure case on September 17, 2010.  The Hills informed both the court and Wells Fargo's attorney that they intended to keep their family home and were trying to find a way to work the matter out. Accordingly, on or about October 10, 2010, the Hills filed a *pro se* appearance and answer, indicating their intent to defend the foreclosure action.  The foreclosure case was set for a continued status hearing on December 17, 2010.

66.     Despite the Hills appearing in court to defend their rights to their home, on or about November 1, 2010, Brian Hill returned home to find that his home had been broken into.

67.     Prior to November 1, 2010, agents of LPS and/or Wells Fargo entered the property located at 1019 Barberry Lane, Round Lake Beach, Illinois 60073 and caused the deadbolt and door knob on the exterior entry door to be removed and replaced, the hot water tank to be drained (by drilling a hole in the floor and making it unserviceable), faucets to be opened to drain the water lines, the main gas valve to be shut off, and antifreeze to be dumped in the toilet.

68.     While in the home, LPS and/or Wells Fargo rifled through the Hills' personal effects, and Brian Hill discovered that multiple items of personal property were missing including, most importantly, some of the tools that Mr. Hill relied upon for his livelihood as a carpenter.

69.     Mr. Hill filed a police report and an insurance claim and worked to secure his and his wife's identities with the bank and other financial institutions holding accounts for them because their account numbers could have been compromised during the break-in.

70.     On December 9, 2010, Mr. Hill filed a complaint against Wells Fargo with the Illinois Attorney General.

71.     In his filed complaint, Mr. Hill explaining to the Attorney General that his home had been broken into by the bank's agents while he was still defending a foreclosure action and asking for mortgage assistance.

72.     At the December 17, 2010 status in the foreclosure action, the Hills advised the court and Wells Fargo's attorney of the break-in and theft.

73.     At the December 17, 2010, the judge confirmed that no order had been issued and nothing had transpired in the case which would have given Wells Fargo any right to enter the Hills' home.

74.     At the December 17, 2010 status in the foreclosure action, the judge requested that Wells Fargo's attorney find out what happened, and continued the case for his report.

75.     Despite being on actual notice (from the judge presiding over Wells Fargo's own state court foreclosure action) that no order had been issued and nothing had transpired in Wells Fargo's foreclosure case which would have given Wells Fargo any right to enter the Hills' home, during the following months, Wells Fargo agents (LPS and its sub-contractors) trespassed upon the Hills' property on multiple occasions and (consistent with LPS's standard practice and procedure in Illinois) physically affixed an LPS vacancy sticker to the Plaintiffs' home.  An exemplar of the vacancy sticker is reproduced in relevant part below:



76.     As was its standard practice and procedure in Illinois, LPS agents also affixed form notices on the Hills' home that directed maintenance inquiries to LPS, thereby taking constructive possession of the home:



**NOTICE IN CASE OF EMERGENCY:**

Please contact the phone number below if emergency maintenance is required:

LPS®
FIELD SERVICES
A LENDER PROCESSING SERVICES COMPANY

**LPS Field Services**

**877-841-8568**

77.     During the summer of 2011, Wells Fargo filed a motion for summary judgment in the foreclosure case.

78.     In the summary judgment motion, Wells Fargo asked the Hills to pay costs associated with its agents' break-ins and postings on the Hills' home.

79.     Before any judgment of foreclosure was granted, on or about September 7, 2011, Brian Hill returned home to discover that the locks on the front entry to the garage had been changed.

80.     On or about September 7, 2011, without a court order, agents of LPS and/or Wells Fargo (as is their standard practice and procedure in Illinois), and without permission from the Hills, entered the Hills' property and caused the locks on the front entry to the garage to be changed.

81.     On or about September 7, 2011, without a court order, agents of LPS and/or Wells Fargo (as is their standard practice and procedure in Illinois) also went through the interior of the Plaintiffs' home and photographed the personal property contained therein.

82.     The Hills were forced to hire a locksmith to change the locks back.  The Hills' belongings were once again tampered with and the privacy and security of their personal effects inside the home, including furniture, clothing, and toys, were violated.

83.     On or about September 23, 2011, Defendants' agents entered the Hills' home yet again, without the court's or the Hills' permission, consistent with the standard practice and procedure in Illinois, and took pictures of the home and inventoried its contents:





84.    To gain access to the property on or about September 23, 2011, LPS's agents had to wait until no one was present and breach a secure door.

85.    To the best of Plaintiffs' recollection, based upon the dates of the LPS letters and envelopes and Plaintiffs' notes, and in response to LPS's vacancy postings and mailed letters requesting occupancy status, Brian Hill or the police advised Defendants that the home was in fact occupied on or about each of the following dates (among others) December 16, 2010, January 5, 2011, January 17, 2011, February 5, 2011, February 16, 2011, February 24, 2011, March 16, 2011, April 4, 2011, April 18, 2011, April 29, 2011, May 16, 2011, May 24, 2011, May 29, 2011, June 16, 2011, July 8, 2011, July 18, 2011, August 5, 2011, August 16, 2011, September 6, 2011, December 19, 2011, January 13, 2012, January 19, 2012, February 9, 2012, February 16, 2012, March 9, 2012, March 16, 2012, and April 16, 2012.

86.    Plaintiffs spoke with multiple representatives of LPS, including but not limited to persons identifying themselves as "Jill" and "Estrella" to advise they had not abandoned the home.

87.    LPS's own work orders confirm the Hills were occupying the property.  For example, LPS confirmed Brian Hill was occupying the property on or about June 16, 2010, July 16, 2010, August 16, 2010, September 16, 2012, November 16, 2010, April 29, 2011, July 18,

2011, November 16, 2011, December 19, 2011, January 19, 2012, February 16, 2012, and March 16, 2012, among other instances.

88.     According to documents recently produced in discovery, LPS's regular inspections routinely acknowledged that the Hills had posted "no trespassing" signs on their home, and that the Hills' neighbors had seen them at the property.

89.     Yet, and as was their standard practice and procedure in Illinois, LPS still repeatedly attempted to enter the property

90.     For example, in addition to the earlier break ins, on or about June 18, 2012, LPS's agents tried to use a key to enter the Hills' property:

**Comments:**                    KEY DID NOT WORK: UNK(W)-METER INTER/COVERED; UTILITIES TURNED OFF.





91.     On or about May 16, 2012, LPS's agents again tried to use a key to enter the

Hills' property:

**Comments:**                    KEY DID NOT WORK: UNK(W)-METER INTER/COVERED; UTILITIES TURNED OFF.

 



92.     As is its standard practice and procedure in Illinois, Wells Fargo never sought a court order granting it the right to enter the Hills' home, secure the property, or evict the Hills. Nonetheless, LPS continued its inspections and "preservation" work on the Hills' home, and claimed to do so according to its and Wells Fargo's standard process, practice and procedure for effectuating dispossession/disablement:

### Mortgage Default

- At 45 days delinquent an inspection is ordered
- Inspections continue to be ordered unless
  — Loan status changes
  — Property identified First Time Vacant
    - Preservation work begins
    - Inspections continue based on client business rules
      — Interior / Exterior inspections ordered at this time

Tampa, FL | May 2011            LPS Field Services Supplier Conference            51

93.     To date, as is the standard practice and procedure in Illinois, LPS continues to send out its agents to case the Hills' home, even during the pendency of this suit.

### Anthony and Tammy Dugo

94.     Wells Fargo retained LPS as its agent to effectuate entries into the Dugos' home at 436 Flint Trail, Carol Stream, Illinois 60188 and change the locks, prior to the entry of any court order granting possession to Wells Fargo.

95.     On or about May 21, 2012, the Dugos' son Dan came home to mow his parents' lawn and discovered that the locks to the Dugos' front door had been changed, barring the Dugos from entering their home.

96.     After several frantic phone calls, the Dugos learned that it was Wells Fargo that had ordered the lock-out.  Moreover, while the Dugos were given a key code for a lock box on their home, there was no lock box and the Dugos were not able to re-enter the home.

97.     The Dugos had to hire a locksmith to re-enter their property.

98.     When the Dugos eventually got back in, they discovered that someone had removed the kitchen window screen, entering their home through the kitchen window.

99.     The water valve on the hot water tank had been turned off, causing water to leak from the relief valve and damaging the floor tile adjacent to the water tank.

100.    Further, as the Dugos' son was walking home from school, he saw a white van parked in the driveway.  Two males were sitting inside the van taking pictures of the Dugos' home.

101.    When the Dugos called the Carol Stream Police Department to report the break-in, an officer was dispatched to the Dugos' home.

102.    The officer, James Lucas, spoke with an agent from LPS and the May 25, 2012 police report reflects, "The agent confirmed that a representative from their company was at the Flint house on 05/15/12. The agent also related that their representative did change the door handles and locks."

103.    On or about May 25, 2012, LPS returned to the Dugos' home again and placed the following sticker on the Dugos' window, adjacent to the front door of the house, visible to anyone passing by the home, and indicating the property was vacant, in violation of HUD Regulations:



104.    At no point prior to the May 2012 break-ins or May 25, 2012 vacancy posting had Wells Fargo secured a court order granting it possession of the Dugos' home.

105.     LPS's notice falsely threatens dispossession or disablement of property (by securing and/or winterizing the Dugos' home) even though such action is prohibited in the absence of a court order.

106.     In fact, the IMFL grants mortgagors like the Dugos the right to remain in their homes during the foreclosure process, and makes it a Class B misdemeanor to induce occupants to abandon mortgaged premises.

107.     Wells Fargo asserted that the Dugos were responsible for the costs of Wells Fargo's "inspections," billing the Dugos for the same over multiple months.  For example, one reinstatement quote sent to the Dugos itemized "inspection fees" as follows:

| Corporate Advances | 07/06/2009 | INSP | Other | | | | 10/10/2006 | Inspection Fee | 1 | $15 00 | $15 00 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Corporate Advances | 07/28/2009 | INSP | Other | | | | 11/20/2006 | Inspection Fee | 1 | ($45 00) | ($45 00) |
| Corporate Advances | 08/27/2009 | INSP | Other | | | | 04/10/2007 | Inspection Fee | 1 | $15 00 | $15 00 |
| Corporate Advances | 10/02/2009 | INSP | Other | | | | 05/04/2007 | Inspection Fee | 1 | $15 00 | $15 00 |
| Corporate Advances | 10/30/2009 | CLR BAL | Other | | | | 09/11/2007 | Inspection Fee | 1 | ($30 00) | ($30 00) |
| Corporate Advances | 11/05/2009 | INSP | Other | | | | 12/02/2009 | Inspection Fee | 1 | $15 00 | $15 00 |
| Corporate Advances | 11/06/2009 | CLR BAL | Other | | | | 05/27/2010 | Inspection Fee | 1 | $15 00 | $15 00 |
| Corporate Advances | 11/27/2009 | BPO | Other | | | | 06/28/2010 | Inspection Fee | 1 | $15 00 | $15 00 |
| Corporate Advances | 06/28/2010 | BPO | Other | | | | 07/22/2010 | Inspection Fee | 1 | $15 00 | $15 00 |
| Other | 07/14/2005 | Inspection Fee | 1 | $15 00 | | $15 00 | | | | | |
| Other | 08/12/2005 | Inspection Fee | 1 | $15 00 | | $15 00 | | | | | |
| Other | 10/06/2005 | Inspection Fee | 1 | $15 00 | | $15 00 | | | | | |
| Other | 11/29/2005 | Inspection Fee | 1 | ($45 00) | | ($45 00) | | | | | |
| Other | 01/13/2006 | Inspection Fee | 1 | $15 00 | | $15 00 | | | | | |
| Other | 01/16/2006 | Inspection Fee | 1 | ($15 00) | | ($15 00) | | | | | |
| Other | 02/09/2006 | Inspection Fee | 1 | $15 00 | | $15 00 | | | | | |
| Other | 02/13/2006 | Inspection Fee | 1 | ($15 00) | | ($15 00) | | | | | |
| Other | 03/31/2006 | Inspection Fee | 1 | $15 00 | | $15 00 | | | | | |
| Other | 05/09/2006 | Inspection Fee | 1 | $15 00 | | $15 00 | | | | | |
| Other | 05/15/2006 | Inspection Fee | 1 | ($15 00) | | ($15 00) | | | | | |
| Other | 08/04/2006 | Inspection Fee | 1 | $15 00 | | $15 00 | | | | | |

108.     These continued "inspections" of the Dugos' home were a step in the process utilized by Defendants to dispossess the Dugos of their home prior to the entry of any court order granting possession to Wells Fargo.

## CLASS ALLEGATIONS

### CLASS A:
### SEEKS STATUTORY DAMAGES FOR VIOLATIONS OF THE FDCPA AGAINST DEFENDANT LPS FOR ITS USE OF A FORM NOTICE THAT UNLAWFULLY THREATENS DISABLEMENT/DISPOSSESSION OF PROPERTY

109.     Class A consists of all State of Illinois property owners who: a) in the one year period prior to the filing of this action; b) had their property inspected (as reflected by LPS's and/or Wells Fargo's and/or their agents' property inspection billing records); and c) LPS posted the notice in ¶ 32 above, having "found" the property to be "vacant/abandoned" (as reflected in LPS's and/or Wells Fargo's and/or their agents' property inspection billing records); and d) there was no court order granting the mortgagee any right to enter the property, much less to enter upon and affix to the property such notice (effectively dispossessing homeowners of their property interests by interfering with the exclusive use and enjoyment of possession of the property and depriving homeowners of the safe and secure use of the property.)

110.     Because the form language of the notice falsely threatens imminent nonjudicial action to effect dispossession and/or disablement of property (*i.e.* to secure or winterize the property) and/or deceptively seeks to impose upon the homeowner an obligation to call as the sole means to avoid such imminent dispossession and/or disablement, when no such obligation exists, and because such actions of dispossession and/or disablement cannot legally be taken, the notice uniformly violates the FDCPA.  As such, the class is entitled to statutory damages.

**CLASS B:**
**SEEKS INJUNCTIVE AND/OR DECLARATORY RELIEF FOR VIOLATIONS OF THE ICFA AGAINST DEFENDANTS LPS AND WELLS FARGO FOR THE USE OF A FORM NOTICE THAT THREATENS DISPOSSESSION**

111.    Class B consists of all State of Illinois property owners who: a) in the three year period prior to the filing of this action; b) had their property inspected (as reflected by LPS's and/or Wells Fargo's and/or their agents' property inspection billing records); and c) LPS posted the notice in ¶ 32 above having "found" the property to be "vacant/abandoned" (as reflected in LPS's and/or Wells Fargo's and/or their agents' property inspection billing records) and d) there was no court order granting the mortgagee the right to enter the property, much less the right to enter upon and affix to the property such notice (effectively dispossessing homeowners of their property interests by interfering with the exclusive use and enjoyment of possession of the property and depriving homeowners of the safe and secure use of the property.)

112.    Because the act of physically affixing the notice to the property of an Illinois homeowner cannot legally be taken, the notice violates the ICFA and injunctive and/or declaratory relief is appropriate.

113.    Because the form language of the notice, reproduced below, falsely threatens imminent nonjudicial action to effect dispossession and/or disablement of property (*i.e.* to secure or winterize the property) and/or deceptively seeks to impose upon the homeowner an obligation to call as the sole means to avoid such imminent dispossession and/or disablement, when no such obligation exists, and because such actions of dispossession and/or disablement cannot legally be taken (specifically, the IMFL which requires a court order for such entry), the notice violates the ICFA and injunctive and/or declaratory relief is appropriate.

114.    Because the act of physically affixing the notice reproduced below to the property of an Illinois homeowner subjects the property to a heightened risk of criminal activity and

31

renders the home substantially more insecure, the notice violates the ICFA and injunctive and/or declaratory relief is appropriate.

## SUB-CLASS B:
## SEEKS ACTUAL AND PUNITIVE DAMAGES FOR VIOLATIONS OF THE ICFA AGAINST DEFENDANTS LPS AND WELLS FARGO FOR THE USE OF A FORM NOTICES THAT THREATENS DISPOSSESSION

115.    Sub-Class B consists of all State of Illinois property owners who: a) in the three year period prior to the filing of this action; b) had their property inspected (as reflected by LPS's and/or Wells Fargo's property inspection records and/or property inspection billing records); c) LPS posted the notice in ¶ 32 above having "found" the property to be "vacant/abandoned" (as reflected in LPS's and/or Wells Fargo's property inspection records and/or property inspection billing records); d) there was no court order granting the mortgagee the right to interfere with the homeowners' exclusive use and enjoyment of possession of the properties; and e) the class member called 440.633.4201 within 3 days of the Defendants' posting of the notice, as reflected in LPS's collection logs, computer records and/or telephone records.

116.    Because the form notice falsely threatens nonjudicial action to effect dispossession or disablement of property (*i.e.* to secure or winterize the property) when such action or threat violates Illinois law (specifically, the IMFL which requires a court order for such entry), and the class members took action as a result of the notice, an award of actual and punitive damages is appropriate.

## CLASS C:
## SEEKS ACTUAL AND STATUTORY DAMAGES FOR VIOLATIONS OF THE FDCPA AGAINST DEFENDANT LPS FOR UNLAWFUL ENTRY INTO ILLINOIS HOMES

117.    Class C consists of all State of Illinois property owners who: a) in the one year period prior to the filing of this action; b) LPS entered their property (as reflected in LPS's

and/or Wells Fargo's property inspection records and/or property inspection billing records), to photograph and inventory personal property, trash out, rekey, lock-out, secure, and/or to winterize the property; and c) there was no court order granting the mortgagee the right to interfere with the homeowners' exclusive use and enjoyment of the properties.

118.    Because LPS took nonjudicial action to effect dispossession or disablement of property (*e.g.* to gain entry, photograph and inventory personal property contents, break in, trash out, rekey, lock-out, secure, and/or winterize the property) when such action violates Illinois law (because the IMFL requires a court order for such actions), those actions violate the FDCPA and Plaintiffs and the members of the class are entitled to statutory and actual damages.

**CLASS D:**
**SEEKS INJUNCTIVE AND/OR DECLARATORY RELIEF UNDER THE ICFA**
**AGAINST LPS AND WELLS FARGO TO STOP THEIR PRACTICE OF ENTERING**
**ILLINOIS HOMES WITHOUT A COURT ORDER**

119.    Class D consists of all State of Illinois property owners who: a) in the three year period prior to the filing of this action; b) LPS entered their properties (as reflected by LPS's and/or Wells Fargo's property inspection records and/or property inspection billing records) to gain entry, photograph and inventory personal property contents, break in, trash out, rekey, lock-out, secure, and/or to winterize the property; and c) there was no court order granting the mortgagee the right to interfere with the homeowners' exclusive use and enjoyment of the properties.

120.    Because Defendants' entries into Plaintiffs' and the class members' homes to gain entry, photograph and inventory personal property contents, break in, trash out, rekey, lock-out, secure, and/or to winterize the property are prohibited under Illinois law (specifically, the IMFL which requires a court order for such entry), such conduct violates the ICFA and injunctive and/or declaratory relief is appropriate.

33

**SUB-CLASS D:**
**SEEKS ACTUAL AND PUNITIVE DAMAGES FOR VIOLATIONS OF THE ICFA**
**AGAINST DEFENDANTS LPS AND WELLS FARGO FOR THE USE OF FORM**
**NOTICES WHICH THREATEN DISPOSSESSION UNLESS A RETURN TELEPHONE**
**CALL IS MADE**

121.    Sub-Class D consists of all State of Illinois property owners who: a) in the three-

year period prior to the filing of this action; b) LPS entered their properties (as reflected by

LPS's and/or Wells Fargo's property inspection records and/or property inspection billing

records) to gain entry, photograph and inventory personal property contents, break in, trash out,

rekey, lock-out, secure, and/or to winterize the property; and c) there was no court order granting

the mortgagee the right to interfere with the homeowners' exclusive use and enjoyment of the

properties.

122.    Because Defendants' entries into Plaintiffs' and the class members' homes

violated Illinois law, and the class members were damaged as a result, an award of actual and

punitive damages is appropriate.

123.    On information and belief, Classes A-D and the Subclasses are so numerous that

joinder of all individual members in one action would be impracticable.

124.    The claims of the Hills and the Dugos are typical of the claims of the class

members.  All are based upon the same legal theories and arise from the same unlawful conduct.

125.    There are common questions of law and fact affecting members of the class,

which common questions predominate over questions that may affect only individual members,

rendering certification the superior method of resolution.  These common questions include, but

are not limited to:

      a.      For Class A, Class B and Subclass B: (1) whether LPS's practice of posting form
              notices violates the FDCPA; (2) whether LPS's form notices falsely, deceptively
              or unfairly state a consumer's obligations and a mortgagee's rights in violation of
              the ICFA; and (3) whether the act of publicly posting an announcement that a

property has been found by LPS to be vacant and/or abandoned is an unfair practice in violation of the ICFA due to the fact that public announcement subjects the property and its owner to heightened criminal activity with no legitimate purpose.

b.    For <u>Class C, Class D and Subclass D</u>:  whether Defendants' practices of entering homes, photographing and inventorying their contents, trashing out, rekeying, securing, and/or winterizing homes without a hearing or court order authorizing such practices violates the FDCPA and ICFA.

126.    Plaintiffs will fairly and adequately represent Classes A-D and the Subclasses. Plaintiffs have no interests that conflict with the interests of the class members. Plaintiffs have retained counsel experienced in handling consumer class actions.

127.    This action should be maintained as a class action because the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual members that would establish incompatible standards of conduct for the Defendants.

128.    Plaintiffs will seek certification under Fed. R. Civ. P. 23(b)(3) with regard to <u>Class A</u> and <u>Class C</u> and <u>Subclass B</u> and <u>Subclass D</u> and under Fed. R. Civ. P. 23(b)(2) for <u>Class B</u> and <u>Class D</u>.

129.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to <u>Class B</u> and <u>Class D</u> because:

a.    At all relevant times, no court had found that Defendants were entitled to possession of the Plaintiffs' or the class members' homes;

b.    At all relevant times, there were no court orders allowing Defendants access to the Plaintiffs' or the class members' homes.

**<u>COUNT I</u>**
***Violations of the Fair Debt Collection Practices Act***
***Against Defendant LPS Field Services, Inc.***

130. Plaintiffs restate, reallege, and incorporate herein by reference paragraphs 1-129 as if set forth fully herein.

131. This Count is brought on behalf of Plaintiffs and Classes <u>A</u> and <u>C.</u>

132. Defendant LPS Field Services is a debt collector as, under 15 U.S.C. § 1692a(6), "such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purposed of which is the enforcement of security interests."

133. Defendant LPS Field Services is subject to liability under 15 U.S.C. § 1692f(6).

134. 15 U.S.C. § 1692f(6) prohibits "<u>taking or threatening</u> to take any nonjudicial action to effect dispossession or disablement of property if -

> (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;
>
> (B) there is no present intention to take possession of the property; or
>
> (C) the property is exempt by law from such dispossession or disablement."

(emphasis added)

135. LPS and its agents made threats of nonjudicial action, and took nonjudicial action, to effectuate the dispossession or disablement of property belonging to Plaintiffs and the class members in order to enforce a security interest.

136. Black's Law Dictionary defines "threat" as "[a] communicated intent to inflict harm or loss on another or another's property, especially one that might diminish a person's freedom to act voluntarily…"

137. LPS and its agents threatened to take nonjudicial action to effect the dispossession or disablement of property through the following acts:

> A. Posting vacancy notices that threatened homeowners with the dispossession of their property (by virtue of their properties being

"secured") and the disablement of their property (by virtue of their properties being "winterized");

B. Posting vacancy notices that falsely communicated an intent to inflict loss of property in a time frame which was not intended and/or incapable of being effectuated legally;

C. Posting vacancy notices that falsely/deceptively communicated an obligation to call LPS as the sole means to avoid the disablement and/or dispossession of their interests in the property, when the only legal means for the lender to effectuate disablement and/or dispossession would require an actual notice of motion and opportunity for the owner to be heard, before taking such actions;

D. Posting vacancy notices that communicated an intent to imminently inflict loss of property;

E. Continuing its efforts to threaten to secure or winterize properties by, (i) re-posting vacancy notices, or (ii) marking another visit date on the previously posted vacancy notice, even after homeowners called in response to the vacancy notices to advise the properties were not vacant.

138. These threats occurred when neither LPS nor Wells Fargo had any present right to possession of the property.

139. These threats are to be viewed through the eyes of the hypothetical unsophisticated consumer.

140. Neither LPS nor Wells Fargo had any present right to possession of the property because: (a) 735 ILCS 5/15-1706 requires notice, motion practice, and affidavits before an order of possession can be granted to Wells Fargo and no such motion practice and affidavits were filed; and (b) 735 ILCS 5/15-1701(b) provides that the mortgagor shall remain in possession of residential real estate prior to the entry of a judgment of foreclosure.

141. LPS's posted vacancy notices constitute a constructive eviction of the mortgagor because such notices were posted as a part of LPS's process of multiple, repeated exterior and interior home inspections to deprive the mortgagor of the enjoyment of his property. LPS also

37

took action to continues "secure" (change locks) or "winterize" (disable plumbing and other fixtures) properties in the face of its own agents' reports that the properties were occupied.

142.     LPS's posted vacancy notices also misrepresent the mortgagee's rights of possession and make false statements as to the ability to secure or winterize the home.  LPS's vacancy notices threaten dispossession and/or disablement of property when such conduct must first be approved by the court where a foreclosure action is pending.  The vacancy notice unlawfully states, "Accordingly, it is likely that the mortgage holder will have the property secured and/or winterized within the next few days," when such conduct cannot lawfully be done.

143.     Posting a notice on a homeowner's private property constitutes dispossession of the homeowner because it is the owner's right to post notices granting access.  LPS's vacancy notices unlawfully convey that the owner has permitted access to the home or has somehow abandoned it and invites criminal activity.

144.      Posting the vacancy notice at issue on a homeowner's property is an act to effectuate dispossession of the homeowner by interfering with the homeowner's right of quiet enjoyment.

145.     Posting a notice on a homeowner's private property diminishes the ability of the homeowner to act voluntarily because, at any time when the homeowner leaves the home, there is a real threat of imminent dispossession, disablement through winterization and lock changes, and home invasion.

146.     Posting a notice on a homeowner's private property requiring the homeowner to call a number (when no such requirement exists in the IMFL) also diminishes the ability of the

homeowner to act voluntarily because, if no call is made, there is a real threat of imminent dispossession, disablement through winterization and lock changes, and home invasion.

147.    Because LPS takes pictures of the homes after the notices are posted and, on information and belief, uploads them to a publically accessible URL, LPS has dispossessed the homeowner from the quiet enjoyment of property and has violated the homeowner's reasonable expectation of privacy in the home.

148.    These threats also occurred when the properties were exempt by law from dispossession or disablement because: (a) 735 ILCS 5/15-1706 requires notice, motion practice, and affidavits before an order of possession can be granted to Wells Fargo and no such motion practice and affidavits were filed; and (b) 735 ILCS 5/15-1701(b) provides that the mortgagor shall remain in possession of residential real estate prior to the entry of a judgment of foreclosure.

149.    LPS and its agents also took nonjudicial action to effect the dispossession or disablement of property by:

      A.    Posting vacancy notices that threatened homeowners with the dispossession of their property (by virtue of their properties being "secured") and the disablement of their property (by virtue of their properties being "winterized");

      B.    Continuing its efforts to threaten to secure or winterize properties by, (i) re-posting vacancy notices, or (ii) marking another visit date on the previously posted vacancy notice, even after homeowners called in response to the vacancy notices to advise the properties were not vacant;

      C.    Attempting to enter locked homes with master keys in order to gain access to the interior of the property, to photograph and catalogue the personal property inside the home, and to begin trash out and winterization procedures;

      D.    Entering locked homes through breaking in, picking locks or changing locks in order to gain access to the interior of the property, to photograph

and catalogue the personal property inside the home, and to begin trash out and winterization procedures.

150.    The above actions occurred when neither LPS nor Wells Fargo had any present right to possession of the property.

151.    The above actions must be viewed through the eyes of the hypothetical unsophisticated consumer.

152.    Neither LPS nor Wells Fargo had any present right to possession of the property because: (a) 735 ILCS 5/15-1706 requires notice, motion practice, and affidavits before an order of possession can be granted to Wells Fargo and no such motion practice and affidavits were filed; and (b) 735 ILCS 5/15-1701(b) provides that the mortgagor shall remain in possession of residential real estate prior to the entry of a judgment of foreclosure.

153.    These takings also occurred when the properties were exempt by law from dispossession or disablement because: (a) 735 ILCS 5/15-1706 requires notice, motion practice, and affidavits before an order of possession can be granted to Wells Fargo and no such motion practice and affidavits were filed; and (b) 735 ILCS 5/15-1701(b) provides that the mortgagor shall remain in possession of residential real estate prior to the entry of a judgment of foreclosure

154.    Both LPS's threats and actual takings were performed when there was no present right to possession, and the property was exempt from dispossession or disablement, in violation of § 1692f(6), because foreclosure actions are filed under the authority of the IMFL and the IMFL provides that dispossession of the Plaintiffs' and the class members' properties is governed exclusively by the courts presiding over the foreclosure actions (735 ILCS 5/15-1106), and the IMFL grants mortgagors the right to remain in their homes pending the foreclosure process (735 ILCS 5/15-1701(b)).

155.     The IMFL also makes it a Class B misdemeanor to induce occupants to abandon mortgaged premises, with 735 ILCS 5/15-1104 stating:

> Any person who willfully misrepresents to the Court any fact resulting in a finding of abandonment of mortgaged real estate in connection with subsection (b) of Section 15-1603 or subsection (d) of Section 15-1706 of this Article [735 ILCS 5/15-1603 or 735 ILCS 5/15-1706] or who threatens to injure the person or property of occupants of mortgaged real estate, or who knowingly gives such occupants false and misleading information, or who harasses or intimidates such occupants, with the intent of inducing such occupants to abandon the mortgaged premises, in order to obtain a finding of abandonment under subsection (b) of Section 15-1603 or subsection (d) of Section 15-1706 of this Article [735 ILCS 5/15-1603 or 735 ILCS 5/15-1706], shall be guilty of a Class B misdemeanor.

(emphasis added)

156.     LPS and its agents unlawfully attempted to induce abandonment of property by the following conduct, including but not limited to, ordering break-ins, entering homes, photographing and cataloguing personal property within the home, turning off water supplies, changing locks, posting vacancy notices on front doors and windows, and boarding up windows.

157.     LPS's threats and takings were performed when there was no present right to possession because a transfer of possession from one person or entity to another cannot occur where there is a breach of the peace or where a breach of the peace is likely to occur.  Entering through a barricade or locked door or window is conduct which constitutes a breach of the peace and thus is prohibited under Illinois law.

158.     LPS's nonjudicial tactics to effect the dispossession or disablement of property violate 15 U.S.C. § 1692f(6).

159.     LPS and its agents caused classwide actual damages such as: (a) out-of-pocket costs to return properties to their pre-break-in condition; and (b) mortgagors being subjected to an additional purported indebtedness and asked to pay the costs associated with the break-ins, property inspections, and lock changes.

160.     LPS's actions also render it liable to Plaintiffs and the class members for statutory damages under the FDCPA.

WHEREFORE, Plaintiffs ask that this Court enter judgment in their favor and in favor of the proposed class, against Defendant LPS Field Services, Inc. and award:

A)     Actual damages in an amount to be proven at trial;

B)     Statutory damages as provided by 15 U.S.C. §1692k;

C)     Reasonable attorneys' fees and costs; and

D)     Such other and further relief as this Court may deem just and proper.

## COUNT II
### *Violations of the Illinois Consumer Fraud Act*
### *Against All Defendants*

161.     Plaintiffs restate, reallege, and incorporate herein by reference paragraphs 1-129 as if set forth fully herein.

162.     This Count is brought on behalf of Plaintiffs and Classes B and D.

163.     815 ILCS 505/2 of the Illinois Consumer Fraud Act ("ICFA") provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" [815 ILCS 510/2], approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45].

164.     Instead of complying with the law and taking the legally required steps to gain possession of mortgaged properties, Defendants unlawfully attempted to take, and in fact took actions to take possession, of the Plaintiffs' and the class members' homes.

165.     Wells Fargo is liable for the actions of LPS, its agent.  In addition, Wells Fargo was negligent or reckless in the selection, instruction, supervision, and retention of LPS. Likewise, LPS is liable for the actions of its agents, and it too was negligent or reckless in the selection, instruction, supervision, and retention of its agents.

166.     Defendants' conduct, individually and through their agents, is unfair and prohibited by the ICFA as it violates public policy.  Breaking and entering into and upon Plaintiffs' and the class members' properties was unfair, unconscionable, and oppressive, in violation of the laws of the State of Illinois.

167.     The laws and public policy of the State of Illinois include the IMFL (735 ILCS 5/15-1101 *et seq*.) which provides, among other things, that:

    A.     The wrongful inducement of abandonment of property is prohibited.

    B.     Mortgagors are entitled to possession of real estate until the court rules otherwise.

    C.     Mortgagors have until thirty days after a judicial confirmation of a sale to remain in their homes.

    D.     Mortgages may only be foreclosed in accordance with the IMFL.

168.     As a result of filing foreclosure actions against Plaintiffs and the class members, Wells Fargo submitted the issues of property vacancy, abandonment, and possession to the state court.  Under 735 ILCS 5/15-1103, once a foreclosure lawsuit is filed, the jurisdiction of the court "continues during the entire pendency of the foreclosure and until disposition of all matters arising out of the foreclosure."  (Emphasis added).

169.     735 ILCS 5/15-1706 provides that requests for mortgagees to be placed in possession must be supported by affidavit or other sworn pleading.

170.    The IMFL makes it a Class B misdemeanor to induce occupants to abandon

mortgaged premises, with 735 ILCS 5/15-1104 stating:

> Any person who willfully misrepresents to the Court any fact resulting in a finding of
> abandonment of mortgaged real estate in connection with subsection (b) of Section 15-
> 1603 or subsection (d) of Section 15-1706 of this Article [735 ILCS 5/15-1603 or 735
> ILCS 5/15-1706] or who threatens to injure the person or property of occupants of
> mortgaged real estate, or who knowingly gives such occupants false and misleading
> information, or who harasses or intimidates such occupants, with the intent of inducing
> such occupants to abandon the mortgaged premises, in order to obtain a finding of
> abandonment under subsection (b) of Section 15-1603 or subsection (d) of Section 15-
> 1706 of this Article [735 ILCS 5/15-1603 or 735 ILCS 5/15-1706], shall be guilty of a
> Class B misdemeanor.

(emphasis added)

171.    Defendants' actions were unfair, unconscionable, and oppressive in that they

summarily threatened to take and/or did take possession of Plaintiffs and the class members'

properties without legal authority.  This conduct is also unfair in that it is inconsistent with the

IMFL and the form foreclosure notice provided to homeowners under Illinois law, which states

that "The lawful occupants of a home have the right to live in the home until a judge enters an

order for possession."  735 ILCS 5/15-1504.5 (emphasis added).

172.    Defendants' actions were unfair, unconscionable, and oppressive in that

Defendants entered into and took possession of Plaintiffs' property when Defendants knew that

Plaintiffs could not have "abandoned" the property.  For example, the Hills' home was filled

with their personal possessions, they had appeared to defend the state foreclosure action, they

had filed a complaint with the Illinois Attorney General, and they had notified Defendants on

repeated occasions their property was not abandoned.  Likewise, the Dugos were in the process

of negotiating a deed in lieu of foreclosure with Wells Fargo and had specifically been granted

time to remain in the home and begin the difficult process of moving their belongings out.

173.    Defendants' actions were also unfair, unconscionable, and oppressive in that

Defendants knew or should have known such conduct would be likely to incite turbulence or violence and thus, give rise to a breach of the peace, as evidenced by LPS's training materials emphasizing the inherently dangerous aspects of home inspections, postings, and entries.

174.     Defendants' actions were also unfair, unconscionable, oppressive and reckless in that Defendants knew or should have known that using lockboxes with access codes published on the Internet risks further crimes, personal injury and property loss.

175.     Defendants' actions were also unfair, unconscionable, and oppressive in that Defendants knew or should have known posting vacancy stickers violated HUD Regulations and increased risks of thefts, personal injury, and property loss.

176.     Defendants' actions were also unfair, unconscionable, and oppressive in that entering homes without legal authority constitutes criminal trespass to real property and interferes with a homeowner's rights of quite enjoyment.

177.     Defendants' actions were also unfair, unconscionable, and oppressive in that changing locks, disabling plumbing supplies, or taking other actions to winterize properties amounts to constructive eviction.

178.     Wells Fargo's regular practice is to hire agents such as LPS Field Services without any pre-judgment court order permitting such action.

179.     Defendants' attempts to take possession of Plaintiffs' and the class members' properties was unethical, immoral, oppressive, and unscrupulous in that, among other things, it deprived Plaintiffs and the class of their legal rights to remain in their homes.

180.     Defendants' conduct is not just unfair but it is also deceptive.

181.     LPS's vacancy notices falsely threaten dispossession or disablement by stating the property will be secured or winterized because: (a) 735 ILCS 5/15-1706 requires notice, motion

practice, and affidavits before an order of possession can be granted to Wells Fargo and no such

motion practice and affidavits were filed; and (b) 735 ILCS 5/15-1701(b) provides that the

mortgagor shall remain in possession of residential real estate prior to the entry of a judgment of

foreclosure.

182. LPS's vacancy notices falsely threaten disablement of property by stating the

property will be winterized because: (a) 735 ILCS 5/15-1706 requires notice, motion practice,

and affidavits before an order of possession can be granted to Wells Fargo and no such motion

practice and affidavits were filed; and (b) 735 ILCS 5/15-1701(b) provides that the mortgagor

shall remain in possession of residential real estate prior to the entry of a judgment of

foreclosure.

183. LPS's vacancy notices contain language which specifically misrepresents the

rights of a lawful occupant to live in the home until a judge enters an order for possession.

184. Including a telephone number to call if the property is occupied does not mitigate

the false statements and misrepresentations contained within LPS's vacancy notices because,

even when the homeowner advises the property is occupied, Defendants continue their efforts to

effectuate securing the property for Wells Fargo's benefit.

185. LPS's vacancy notices are also deceptive in that they misstate, by material

omission, the procedure by which a lender must gain legal permission for entry.

186. Defendants' actions and representations were made with the intent that Plaintiffs

and the class members rely on them and: (a) call the number on the notice; (b) vacate or abandon

the premises; or (c) permit Defendants to continue interfering with the Plaintiffs' right to use and

enjoy the property.

187. Plaintiffs and the class members were substantially damaged as result of

Defendants' conduct in that, among other things, they were dispossessed of their homes, suffered damage to their homes, suffered damage to and loss of their personal effects in their homes, and were charged for the trespasses Defendants wrongfully performed in the form of inspection fees.

188.     Defendants' conduct occurred in the course of trade or commerce of Illinois.

WHEREFORE, Plaintiffs ask that this Court enter judgment in their favor and in favor of the proposed class, against Defendants Wells Fargo Bank, N.A. and LPS Field Services, Inc. and award:

A)     Injunctive relief as appropriate;

B)     Actual and punitive damages under the Illinois Consumer Fraud Act, 815 ILCS 505/10;

C)     Reasonable attorneys' fees and costs; and

D)     Such other and further relief as this Court may deem just and proper.

### COUNT III
### *Trespass, Brought By Plaintiffs, Individually, Against all Defendants*

189.     Plaintiffs restate, reallege, and incorporate herein by reference paragraphs 1-129 as if set forth fully herein.

190.     This Count is brought on behalf of Plaintiffs Brian and Melissa Hill, and Anthony and Tammy Dugo, individually.

191.     Plaintiffs were in exclusive possession of their homes and, at all times relevant, they did not relinquish their right to the quiet enjoyment of their properties.

192.     Plaintiffs did not abandon their properties and never indicated they had given up their rights to the property or relinquished control over it. To the contrary, Defendants knew the Plaintiffs were not giving up their absolute right to exclusive possession prior to invading the property because, among other things: (a) the Hills' home was filled with personal belongings

47

and furniture and the Hills had appeared in court to defend the foreclosure proceeding; and (b) the Dugos were in the process of negotiating a deed in lieu of foreclosure and had not yet granted Wells Fargo possessory rights to their home.

193. At all relevant times, Plaintiffs had an absolute right to exclusive possession to their properties because Wells Fargo never obtained any judicial order of possession or judicial confirmation of sale, and Defendants knew with a substantial degree of certainty that entering the properties would result in an intrusion upon Plaintiffs' possessory rights and personal sanctuary.

194. The mortgage foreclosure summons sent to all Plaintiffs states, "You continue to own your home until the court rules otherwise."

195. The mortgage foreclosure summons sent to all Plaintiffs further states, "The lawful occupants of a home have the right to live in the home until a judge enters an order for possession."

196. Defendants' employees or agents intentionally entered Plaintiffs' homes without legal justification or authorization when Plaintiffs' homes were not abandoned.

197. Defendants used their employees or agents to break into Plaintiffs' homes and change the locks on their doors, prior to any judicial order granting them authority to do so.

198. Wells Fargo knew at the time it sent agents to enter the Plaintiffs' homes that there was no right to effectuate the equivalent of a pre-foreclosure, non-judicial dispossession.

199. The fact that Defendants' employees or agents had to break existing locks to gain access to the Plaintiffs' homes shows the entries were neither peaceful nor limited to any purpose to securing the homes.

200. Defendants knew or should have known that sending employees or agents to break into Plaintiffs' homes would result in an illegal intrusion.

201.    Plaintiffs were damaged as a result of Defendants' conduct.  Among other things, their properties were damaged, they were dispossessed of their homes, and they were forced to live in a constant state of fear and anxiety over another break-in.

202.    The Hills had to pay money to fix their locks, lost property that was not fully repaid under insurance, and spent time, money and effort to fix the damage caused by the multiple break-ins.

203.    The Dugos had to pay money to fix their locks and spent time and effort working with counsel to try and re-enter their home and gather their belongings to move out.

WHEREFORE, Plaintiffs ask that this Court enter judgment in their favor against Defendants Wells Fargo Bank, N.A. and LPS Field Services, Inc. and award:

A)      Actual and punitive damages; and

B)      Such other and further relief as this Court may deem just and proper.

### COUNT IV
*Invasion of Privacy, Brought By Plaintiffs, Individually, Against all Defendants*

204.    Plaintiffs restate, reallege, and incorporate herein by reference paragraphs 1-129 as if set forth fully herein.

205.    This Count is brought on behalf of Plaintiffs Brian and Melissa Hill, and Anthony and Tammy Dugo, individually.

206.    Plaintiffs were in possession of their private homes and, all times relevant, they never told Defendants that they relinquished their right to the quiet enjoyment of their properties.

207.    Defendants sent their agents to enter into Plaintiffs' homes without Plaintiffs' authorization.

208.    Defendants' intrusion into Plaintiffs' private homes was without any legal basis.

209.    Plaintiffs' homes were private residences that contained their families' personal

private effects, and as such, Plaintiffs lock their doors in an effort to keep their personal

information and effects private.

210.    Defendants' agents did not just enter Plaintiffs' homes and leave.

211.    Instead, Defendants' agents trespassed into the Hills' home and went through

Plaintiffs' belongings.

212.    Defendants' agents trespassed into the Dugos' home and inventoried the Dugos'

personal effects.

213.    Defendants' intrusion into Plaintiffs' privacy is extremely offensive and shocking

to a reasonable person.

214.    Defendants' conduct caused Plaintiffs actual damages, anguish, and suffering.

WHEREFORE, Plaintiffs ask that this Court enter judgment in their favor against

Defendants Wells Fargo Bank, N.A. and LPS Field Services, Inc. and award:

A)      Actual and punitive damages; and

B)      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the above Classes and Subclasses, demand a trial

by jury.

Respectfully submitted,

By: /s/ Lance A. Raphael
One of Plaintiffs' Attorneys

Lance A. Raphael
Stacy M. Bardo
Allison Krumhorn
Michael S. Hilicki
The Consumer Advocacy Center, P.C.
180 W. Washington St., Suite 700
Chicago, IL 60602
(312) 782-5808