UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN HILL and MELISSA HILL, and ANTHONY DUGO and TAMMY DUGO, on behalf of themselves and all others similarly situated, | ) ) ) | 12 C 7240 |
| | ) | |
| Plaintiffs, | ) | Judge Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., d/b/a WELLS FARGO HOME MORTGAGE, and LPS FIELD SERVICES, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## Memorandum Opinion and Order

In a prior order, the court dismissed part of Brian and Melissa Hill's amended complaint against Defendants Wells Fargo Bank, N.A., and LPS Field Services, Inc. Docs. 86-87 (reported at 946 F. Supp. 2d 817 (N.D. Ill. 2013)). The amended complaint had alleged: (1) violation by LPS of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.; (2) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*.; (3) common law trespass; and (4) invasion of privacy. Doc. 42. The FDCPA and ICFA claims, unlike the trespass and privacy claims, were brought on behalf of a putative class. LPS moved to dismiss the FDCPA and ICFA claims under Federal Rule of Civil Procedure 12(b)(6); the court granted the motion as to the FDCPA claim with leave to replead, but denied the motion as to the ICFA claim to the extent it proceeded on an unfair conduct theory. The court also granted Defendants' Rule 12(f) motion to strike the amended complaint's class allegations.

The Hills then filed a second amended complaint, which adds Anthony and Tammy Dugo as Plaintiffs and sets forth putative Classes A, B, C, and D and Sub-Classes B and D. Doc. 93. Plaintiffs later withdrew Sub-Classes B and D. Doc. 129 at 6 n.1. Like the amended complaint, the second amended complaint alleges (1) violation by LPS of the FDCPA; (2) violation of the ICFA; (3) common law trespass; and (4) invasion of privacy. The FDCPA claim against LPS is brought on behalf of Classes A and C, while the ICFA claim against LPS and Wells Fargo is brought on behalf of Classes B and D; the common law trespass and invasion of privacy claims are brought by Plaintiffs individually. *Ibid*.

LPS moves under Rule 12(b)(6) to dismiss the Hills' FDCPA claim and under Rule 12(f) to strike the portions of the second amended complaint alleging that the form vacancy notice that LPS posted on the Dugos' property violated the FDCPA and that LPS violated the ICFA on a deceptive practices theory. Doc. 102. LPS has also moved to strike the second amended complaint's class allegations with respect to Classes A and C. Doc. 108. Wells Fargo, joined by LPS, Doc. 114, has moved under Rule 12(f) to strike class allegations related to Classes B and D, as well as under Rule 12(b)(6) to dismiss the Dugos' individual claims against Wells Fargo. Doc. 105. Defendants' motions are denied.

## Background

In considering the motions to dismiss and strike, the court assumes the truth of the second amended complaint's factual allegations, though not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court must also consider "documents attached to the [second amended] complaint, documents that are critical to the [second amended] complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' briefs opposing dismissal, so long as those facts "are consistent with

the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The following facts are set forth as favorably to Plaintiffs as these materials allow. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

Brian and Melissa Hill, a married couple, own a residential property in Round Lake Beach, Illinois. Doc. 93 at ¶ 4. Anthony and Tammy Dugo, also a married couple, own a residential property in Carol Stream, Illinois. *Id.* at ¶ 7. Wells Fargo is the mortgagee and mortgage servicer on both properties. *Id.* at ¶¶ 10-11.

In 2001, the Hills took out a $76,599 mortgage loan on their property and, for several years, made their mortgage payments on schedule. *Id.* at ¶¶ 52-53. After Brian lost his job as a carpenter and the family savings were depleted, the Hills missed their October 2009 payment. *Id.* at ¶¶ 54-55. When Brian called to request a loan modification and consideration for different work-out options, Wells Fargo gave the Hills a six-month moratorium. *Id.* at ¶¶ 56-58. At the end of the six-month period, however, Wells Fargo sent the Hills a letter demanding payment in full of the prior six months of deferred payments and threatening foreclosure if they did not pay. *Id.* at ¶ 60.

Wells Fargo commenced a foreclosure action against the Hills in the Circuit Court of Lake County, Illinois, on June 7, 2010. *Id.* at ¶ 61. At the initial status hearing on September 17, 2010, the Hills informed the state court and Wells Fargo that they intended to keep their home and hoped to resolve the matter. *Id.* at ¶ 65. In the meantime, Wells Fargo retained LPS, a provider of "comprehensive preservation services," including the securing and winterization of properties, to act as its agent with respect to the mortgage. *Id.* at ¶¶ 13-14.

LPS "inspect[s], report[s], and perform[s] property preservation and REO [real estate owned] services on mortgaged properties" for mortgage companies like Wells Fargo. *Id.* at ¶ 25.

According to the "General Default Timeline" in LPS's training manual, the first step that LPS takes once it is notified that a resident has failed to timely pay his mortgage is to inspect the property and report on its occupancy status and property condition. *Id*. at ¶ 31. LPS also physically affixes the following removable sticker to a glass surface of the property:

> *NOTICE*
>
> LPS Field Services, Inc., inspected this property and found it to be vacant or abandoned. The mortgage holder has the right and duty to protect this property. Accordingly, it is likely that the mortgage holder will have the property secured and/or winterized within the next few days.
>
> Therefore, if this property is <u>NOT VACANT</u>, please call the number below immediately [the posting gives LPS's telephone number].

*Id*. at ¶¶ 32-33. In addition, LPS mails this form letter asking the resident to confirm the occupancy status of the property: "Dear Resident: We have been requested to contact you by the above company in order to verify that the property at this address is occupied. Please inform us of the property occupancy status by checking the appropriate box below." *Id*. at ¶ 36.

LPS's training manual states that inspections will continue unless the "[l]oan status changes" or the "[p]roperty [is] identified [as] First Time Vacant." *Id*. at ¶ 38. The manual outlines methods by which agents can gain entry into a home and warns of the risks associated with entering a home without the owner's permission. *Id*. at ¶¶ 40-43. At the same time, the manual emphasizes the necessity of "access[ing]" a property, noting that "[i]f property is not accessed[,] there is no way to make a business decision," and that "Access Denied provides no revenue." *Id*. at 40-42. Upon entering a home, LPS agents are required to catalog and photograph the personal possessions within. *Id*. at ¶ 44. If the property is deemed "First Time Vacant," the manual instructs agents to perform "preservation work," which involves changing the locks, removing personal property from the home, and performing winterization services like shutting off water and plumbing. *Id*. at ¶¶ 38, 46.

On or about November 1, 2010, Brian discovered that his home had been broken into. *Id.* at ¶ 66. LPS agents retained by Wells Fargo had entered the Hills' property, removed and replaced the deadbolt and door knob on the exterior door, drained the hot water tank by drilling a hole, opened faucets to drain the water lines, shut off the main gas valve, and dumped antifreeze into the toilet. *Id.* at ¶ 67. The agents had also rifled through the Hills' personal effects, and the Hills noticed that some of their possessions, including tools that Brian used in his work as a carpenter, were missing. *Id.* at ¶ 68. Brian filed a police report, an insurance claim, and a complaint with the Attorney General of Illinois alleging that Wells Fargo's agents had broken into his home while he was still defending the foreclosure action. *Id.* at ¶¶ 69-71. At a status hearing in the foreclosure case on December 17, 2010, the judge, after being advised of the break-in, stated that nothing had transpired in the case that would have given Wells Fargo any right to enter the Hills' home. *Id.* at ¶ 73.

In the following months, LPS agents visited the Hills' property many times and posted form notices on their home, including the vacancy sticker quoted above. *Id.* at ¶ 75. LPS also mailed letters requesting the occupancy status of the Hills' residence. *Id.* at ¶ 85. Both Brian and the police advised LPS that the home was not abandoned on numerous occasions, including on or about December 16, 2010, January 5, 2011, January 17, 2011, February 5, 2011, February 16, 2011, February 24, 2011, March 16, 2011, April 4, 2011, April 18, 2011, April 29, 2011, May 16, 2011, May 24, 2011, May 29, 2011, June 16, 2011, July 8, 2011, July 18, 2011, August 5, 2011, August 16, 2011, September 6, 2011, December 19, 2011, January 13, 2012, January 19, 2012, February 9, 2012, February 16, 2012, March 9, 2012, March 16, 2012, and April 16, 2012. *Ibid.* LPS's reports from inspections of the Hills' property acknowledged that the Hills had posted "no trespassing" signs outside their home and that the Hills' neighbors had seen the Hills

on their property.  *Id*. at ¶ 88.  LPS's work orders confirmed that the Hills' residence was occupied on or about June 16, 2010, July 16, 2010, August 16, 2010, September 16, 2010, November 16, 2010, April 29, 2011, July 18, 2011, November 16, 2011, December 19, 2011, January 19, 2012, February 16, 2012, and March 16, 2012.  *Id*. at ¶ 87.

On or about September 7, 2011, Brian returned home to find that LPS agents had changed the locks on the garage door and tampered with his personal effects.  *Id*. at ¶¶ 79-80, 82. On or about September 23, 2011, LPS agents entered the Hills' home by breaching a secure door and took pictures of the home and inventoried its contents.  *Id*. at ¶ 83.  LPS agents unsuccessfully attempted to use a key to enter the Hills' home on or about June 18, 2012, and again on or about May 16, 2012.  *Id*. at ¶¶ 90-91.  As of the date of the second amended complaint, LPS has continuously sent agents to "case" the Hills' home.  *Id*. at ¶ 93.

Like the Hills, the Dugos had fallen behind on their mortgage payments, and Wells Fargo retained LPS as its agent with respect to their property.  *Id*. at ¶ 94.  The Dugos were in the process of negotiating a deed in lieu of foreclosure with Wells Fargo and had been granted time to remain in the home and to begin moving out their belongings.  *Id*. at ¶ 172.  On or about May 21, 2012, the Dugos' son discovered that the locks to their front door had been changed, preventing them from entering their home.  *Id*. at ¶¶ 95-96.  The Dugos gained entry after hiring a locksmith, only to discover that the kitchen window screen had been removed and that their hot water tank valve had been turned off, causing leakage that damaged the adjacent floor tile.  *Id*. at ¶¶ 97-99.  The Dugos called the police to report the break-in, and the officer dispatched to their home confirmed that "a representative from [LPS] was at the [Dugos'] house on 5/15/12" and that "[the LPS] representative did change the door handles and locks."  *Id*. at ¶¶ 101-02.

Some time later, the Dugos' son noticed a white van on the Dugos' driveway with two men sitting inside taking pictures of the home. *Id*. at ¶ 100. On or about May 25, 2012, LPS placed a form vacancy notice on the front of the Dugos' home, which was identical to that placed on the Hills' property. *Id*. at ¶ 103. Wells Fargo held the Dugos responsible for the costs of LPS's inspections and billed them $15 per inspection over a period of months between 2005 and 2010. *Id*. at ¶ 107.

**Discussion**

As noted above, LPS has moved to dismiss the Hills' FDCPA claim, strike certain portions of Plaintiffs' individual claims, and to strike class allegations with respect to Classes A and C. Both Wells Fargo and LPS have moved to dismiss the Dugos' individual claims, as well as to strike class allegations with respect to Classes B and D. Defendants have not challenged the second amended complaint's trespass and privacy claims.

**I.     LPS's Motion To Dismiss And Strike Portions Of Plaintiffs' Individual Claims**

**A.     LPS's Motion To Dismiss The Hills' FDCPA Claim**

The second amended complaint attempts to replead the Hills' FDCPA claim, which the court dismissed without prejudice in its prior opinion. 946 F. Supp. 2d at 821-25. The pertinent FDCPA provision, 15 U.S.C. § 1692f(6), states:

> § 1692f.  Unfair practices
>
> A debt collector may not use unfair on unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> *   *   *
>
> > (6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—

(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

(B) there is no present intention to take possession of the property; or

(C) the property is exempt by law from such dispossession or disablement.

15 U.S.C. § 1692f(6). As with the first motion to dismiss, LPS's argument turns on whether it took or threatened to take "any nonjudicial action to effect dispossession or disablement" of the Hills' property within the FDCPA's one-year limitations period. *See* 15 U.S.C. § 1692k(d) ("An action to enforce any liability created by this subchapter may be brought … within one year from the date on which the violation occurs."); *Randolph v. IMBS, Inc.*, 368 F.3d 726, 731 (7th Cir. 2004) (same). Because the Hills filed this suit on September 11, 2012, the court may consider only LPS's alleged actions after September 11, 2011.

LPS argues that the Hills' FDCPA claim should again be dismissed because, "[i]nstead of presenting allegations about 'new' and/or additional conduct that occurred during the limitations period, the Hills have in large part simply re-characterized the same conduct that the Court already determined did not violate the FDCPA." Doc. 103 at 6-7. The court's order dismissing the amended complaint's FDCPA claim provides necessary context for this argument; it held that "the few acts alleged [in the amended complaint] to have occurred after September 11, 2011 … do not suffice to state an FDCPA claim." 946 F. Supp. 2d at 822.

First, the amended complaint alleged that on September 23, 2011, "Wells Fargo's agents [presumably persons affiliated with LPS] entered the Hills' home … without the [state] court's or the Hills' permission." Doc. 42 at ¶ 34. But, as the court pointed out, "there [was] no allegation that the LPS agents did anything to prevent the Hills from possessing their home or that the Hills had any difficulty doing so after the September 23 entry, and nor [was] there any

allegation that LPS did anything to disable the home." 946 F. Supp. 2d at 822-23. The court rejected the Hills' assertion that "[u]nauthorized entry into a closed or locked space is sufficient to allege an FDCPA violation," Doc. 59 at 7, as "the Hills do not and could not explain how breaking into a home constitutes a threat to later take possession of or disable it." 946 F. Supp. 2d at 823. Second, the amended complaint alleged that Wells Fargo "instructed LPS to continue performing 'vacant property svcs' on the Hills' home" around October 18, 2011. Doc. 42 at ¶ 35. The court ruled that this allegation did not rise to a FDCPA violation because nowhere did the amended complaint allege "what, if anything, LPS did in response to the instruction Wells Fargo gave." 946 F. Supp. 2d at 823. Third, the court rejected the amended complaint's allegation that LPS agents' trespassing numerous times on the Hills' property, including in June, August, and November of 2012, constituted a FDCPA violation, reasoning that, "[a]s explained above, even an unauthorized entry into the Hills' house is not, without more, a dispossession or disablement or a threat to dispossess or disable." *Ibid.* Fourth, the amended complaint alleged that LPS mailed the Hills several letters inquiring whether their property was occupied and affixed the above-quoted vacancy notice to their residence. Doc. 42 at ¶ 37; Doc 42-3 at 2. With respect to the occupancy letters, the court held that "[a] letter inquiring whether anyone is currently in possession of a home, without more, does not come close to a threat to dispossess the possessor." 946 F. Supp. 2d at 823. And in addressing the vacancy notice, the court noted that while the Hills referred "only to the first of the two paragraphs" of the notice, "[t]he second paragraph undercuts the Hills' submission that an 'unsophisticated consumer' could read the posting as a threat to dispossess them of their property, for it explicitly states that the author [LPS] believes that the property is vacant and means to act on that belief, but that if the property is not vacant, the possessor should inform the author of that fact." *Id*. at 823-24. The court

added that "[n]o one could reasonably read the posting to suggest that if the author is informed that the property is not vacant, he still would attempt to kick out the owner," and thus "[n]o person 'capable of making basic … inferences' could read the posting to threaten dispossession or disablement." *Id.* at 824 (second alteration in original). Accordingly, the court concluded that "none of the alleged acts occurring within the limitations period violate § 1692f(6)." *Ibid.*

Contrary to LPS's submission, the second amended complaint does not "simply re-characterize[] the same conduct that the Court already determined did not violate the FDCPA." Doc. 103 at 7. True, some of the second amended complaint's allegations are unchanged or only slightly modified. Specifically, the second amended complaint re-alleges that LPS mailed occupancy letters and posted a vacancy notice on the Hills' home containing the same language described above; adds that during the LPS agents' unauthorized entry into the home around September 23, 2011, LPS agents breached a secure door and took pictures of the home and inventoried its contents; and elaborates on the "numerous times [that LPS agents trespassed] on the Hills' property" by specifying that on May 16, 2012 and June 18, 2012, LPS agents unsuccessfully tried to enter the Hills' home using a key. Doc. 93 at ¶¶ 75, 83, 85, 90-91. But the second amended complaint goes further and alleges that "in response to LPS's vacancy postings and mailed letters requesting occupancy status, Brian Hill or the police advised Defendants that the home was in fact occupied" on the following dates within the limitations period: December 19, 2011, January 13, 2012, January 19, 2012, February 9, 2012, February 16, 2012, March 9, 2012, March 16, 2012, and April 16, 2012. Doc. 93 at ¶ 85. Moreover, the second amended complaint alleges that "LPS's own work orders confirm the Hills were occupying the property" within the limitations period on November 16, 2011, December 19, 2011, January 19, 2012, February 16, 2012, and March 16, 2012, and that "LPS's regular

inspections [reports] routinely acknowledged that the Hills had posted 'no trespassing' signs on their home, and that the Hills' neighbors had seen them at the property." *Id*. at ¶¶ 87-88.

LPS argues that "the Hills' allegations relating to their statements to [LPS] are insufficient to state an FDCPA claim." Doc. 103 at 10 (capitalization normalized). This argument fails to consider the second amended complaint's allegations as a whole. Notably, despite (allegedly) being aware that the Hills had routinely reported that their home was not abandoned and that they were in fact occupying their home as late as April 16, 2012, LPS (allegedly) nonetheless attempted to enter the property just weeks later on May 16, 2012 and again on June 18, 2012. This behavior calls into question the sincerity of the vacancy notice, which at least on its face conveys the message that LPS would not attempt to "secure[] and/or winterize[]" the property—which would dispossess or threaten to dispossess the owner—if it is informed that the property is occupied. In this regard, the Hills assert that "LPS posted the notice as one step in a systematic campaign designed to effectuate dispossession, and *not to actually learn whether the home is vacant*." Doc. 130 at 12 (emphasis added). Viewing the second amended complaint's allegations cumulatively and in the light most favorable to the Hills, the court concludes that the Hills, who repeatedly informed LPS that their home was occupied and yet still faced break-in attempts, have plausibly alleged that the assurance provided by LPS's vacancy notice was insincere and that, by repeatedly posting the vacancy notices and sending a blizzard of letters despite knowing that the home was occupied, LPS was threatening to dispossess them of their property. Accordingly, LPS's motion to dismiss the Hills' FDCPA claim is denied.

In urging the opposite result, LPS argues that its actions were required by the following regulation promulgated by the Department of Housing and Urban Development ("HUD"):

The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, *and efforts to reach the mortgagor by telephone within that period have been unsuccessful*, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, *if such action does not constitute an illegal trespass*.

\* \* \*

The mortgagee shall be responsible for damage to or destruction of security properties on which the loans are in default and which properties *are vacant or abandoned*, when such damage or destruction is due to the mortgagee's failure to take reasonable action to inspect, protect and preserve such properties ….

24 C.F.R. §§ 203.377, 203.378(c) (emphases added) (cited at Doc. 142 at 3-4). The Hills respond that this regulation cannot justify LPS's actions because it conditioned LPS's obligation to protect and preserve a property on the property's being "vacant or abandoned," and the second amended complaint pleads that LPS knew the Hills' property was not vacant or abandoned. The Hills are right; although the regulation required LPS to protect and preserve the Hills' property once it is deemed vacant or abandoned, the regulation cannot justify LPS's attempts to protect and preserve the Hills' property while it is still occupied.

LPS next argues that the Hills cannot state a FDCPA claim because this "court has *already ruled* that the 'vacancy' notice allegedly posted by [LPS] on the Hills' property cannot support a claim under the FDCPA." Doc. 142 at 5 (capitalization normalized); *id*. at 7-8. While the court did hold that the language of the vacancy notice, standing alone, could not reasonably be read to threaten dispossession or disablement, the court did not have occasion to consider

whether the totality of LPS's actions, including the repeated posting of the vacancy notice in the face of its knowledge that the property was occupied, states an FDCPA claim.

Finally, LPS contends that unlike the Dugos, who allege that they were locked out of their property within the relevant limitations period, the Hills cannot state a FDCPA claim because they "have not alleged that they were unable to access their property as a result of [LPS's] actions." Doc. 142 at 11. This contention overlooks the fact that *actual* dispossession of property is but one way to state a FDCPA claim. Another way is to *threaten* to dispossess the Hills of their property, *see* 15 U.S.C. § 1692f(6) ("[t]aking or threatening to take any nonjudicial action to effect dispossession … of property"), and the second amended complaint plausibly alleges such a threat.

### B. LPS's Motion To Strike Allegations From The Dugos' FDCPA Claim Relating To LPS's Vacancy Notice

Under Rule 12(f), a district court has the discretion to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *see Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). "Allegations may be stricken as scandalous if the matter bears no possible relation to the controversy or may cause the objecting party prejudice." *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992). LPS asks the court to "strike the allegations in the Dugos' FDCPA claim against [LPS] to the extent they allege that [LPS] violated Section 1692f(6) of the FDCPA by posting notices on their home," arguing that "[f]or the same reasons the Hills' individual claim based on the vacancy notices should be dismissed, the Dugos also may not support their claim against [LPS] under Section 1692f(6) of the FDCPA by alleging that [LPS's] vacancy notices threatened to or actually dispossessed them from their property or disabled it." Doc. 103 at 11. The court is not confused and prejudice will not result

from denying the motion to strike, as the allegations concerning LPS's vacancy notice are relevant to whether LPS's actions, taken as a whole, state a FDCPA claim.

### C. LPS's Motion To Strike Allegations That LPS Engaged In Deceptive Practices In Violation Of The ICFA

LPS next asks the court to "strike all allegations in the second amended complaint that assert that [LPS] engaged in deceptive conduct in violation of the ICFA by posting vacancy notices on their homes." *Id*. at 13. LPS argues that this is necessary because the court has ruled that the language of the vacancy posting did not support a deceptive practices claim under the ICFA. *Ibid*. At this stage in the proceedings, the court declines to strike allegations that the vacancy notices are deceptive because those allegations might possibly have relevance to the FDCPA claim. Should this case proceed to a jury trial, the court will be careful to limit Plaintiffs' ICFA claims to an unfair conduct theory.

## II. Defendants' Motion To Dismiss The Dugos' Individual Claims

Defendants move to dismiss the Dugos' ICFA, trespass, and invasion of privacy claims, arguing that the Dugos released those claims when they executed a Deed in Lieu of Foreclosure Agreement on September 7, 2012. Doc. 107 at 26. A copy of the Deed in Lieu is attached to Defendants' motion to dismiss, Doc. 107-1 at 61, but not to the second amended complaint. The court will consider the Deed in Lieu because it is referenced in the second amended complaint, Doc. 93 at ¶ 172, and central to the Dugos' claim, and also because it is a publicly recorded document subject to judicial notice. *See Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record … without converting a motion to dismiss into a motion for summary judgment."); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) (holding that the court may consider "documents attached to a motion to dismiss … [as] part of the pleadings if they are referred to in the plaintiff's complaint

and are central to his claim") (internal quotation marks omitted) (alterations omitted); *Hardaway v. CIT Grp./Consumer Fin. Inc.*, 836 F. Supp. 2d 677, 686 (N.D. Ill. 2011) (taking judicial notice of "documents available to the public via the Cook County Recorder of Deeds website").

The Deed in Lieu states in relevant part:

<u>WARRANTY DEED IN LIEU OF FORECLOSURE</u>

KNOW ALL MEN BY THESE PRESENTS, that

ANTHONY F. DUGO, JR. AND TAMMY L. DUGO, HUSBAND AND WIFE

the GRANTORS herein, for the consideration of One Dollar ($1.00), and other good and valuable consideration, receipt of which is hereby acknowledged, does give, grant, bargain, sell, warrant and convey unto **U.S. Bank National Association, as Trustee, successor-in interest to Bank of America, N.A., as Trustee, successor to Lasalle Bank, N.A., as Trustee for Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-WF1**, the GRANTEE, his successors and assigns, all of the following described premises situated in the County of DU PAGE, State of Illinois …

* * *

TO HAVE AND TO HOLD the above granted and bargained premises with the appurtenances thereunto belonging, unto the said GRANTEE, his successors and assigns forever. The said GRANTORS do covenant for themselves, their heirs, executors and assigns, that at the signing of these presents, they are well seized of the above described premises as a good and indefeasible estate in fee simple, and have good right to bargain and sell the same in the manner and form as above written; and that the same are free and clear from all encumbrances whatsoever, and that they and their heirs, executors, and assigns will warrant and defend said premises, with the appurtenances thereunto belonging, unto said GRANTEE, his successors and assigns, against al lawful claims and demands whatsoever. *Said GRANTORS hereby releases and waives all rights under and by virtue of the Homestead Exemption laws of the State of Illinois and any other State Law which may apply.*

Doc. 107-1 at 61 (italics added). Focusing on the last sentence, particularly the phrase "releases and waives all rights under … any other State Law which may apply," Wells Fargo argues that

"because the Dugos knew of the alleged entry to the Dugo Property at the time they executed the Deed in Lieu, and because the Dugos released 'all rights' under any state law that may apply, all of the Dugos' claims relating to the Dugo Property against Wells Fargo … are barred." Doc. 107 at 28. Plaintiffs respond that "Wells is reading the last sentence of the deed in isolation, which is improper," and that "[c]onstrued as a whole, the deed only purports to warrant that the Dugos own and are releasing their interest in the property described in the deed, to ensure they are conveying good title to the grantee." Doc. 129 at 9.

Plaintiffs are right. The Deed in Lieu is a contractual release whose interpretation is governed by Illinois law. *See Fleming v. U.S. Postal Serv. AMF O'Hare*, 27 F.3d 259, 262 (7th Cir. 1994); *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). "Thus, the rights of the parties are limited to the terms expressed in the agreement and a release will not be construed to release claims not within the contemplation of the parties. The intention of the parties controls the scope and effect of the release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement." *Loberg v. Hallwood Realty Partners, L.P.*, 753 N.E.2d 1020, 1024-25 (Ill. App. 2001) (citation omitted); *see also River East Plaza, L.L.C. v. Variable Annuity Life Ins. Co.*, 498 F.3d 718, 725 (7th Cir. 2007).

The Deed in Lieu's terms make clear that its purpose is for the Dugos to "give, grant, bargain, sell, warrant and convey" their Carol Stream property to U.S. Bank and its successors and assigns, with the guarantee that the property is "free and clear from all encumbrances whatsoever" such that the grantee has "good right to bargain and sell" the property. Doc. 107-1 at 61. Plaintiffs describe as follows the events leading up to the Deed in Lieu's execution on September 7, 2012:

> [A]fter Wells filed the foreclosure action on behalf of the securitization trust that owned the Dugos' [mortgage] loan, the Dugos filed a lawsuit against

> Wells arising from certain actions it took in connection with servicing their loan. Eventually, the Dugos and Wells agreed to settle both lawsuits together.
>
> Under the Settlement [agreement, effective March 22, 2012], Wells agreed to resolve the Dugos' lawsuit by giving them a sum of money and other relief, and the Dugos agreed to resolve Wells' foreclosure action by taking one of two actions: (a) executing a deed in lieu of foreclosure, or (b) entering into a consent judgment of foreclosure. The Settlement gave Wells the right to choose at a later date which action the Dugos would take.

Doc. 129 at 11. The alleged break-in and lock-out of the Dugos' property by LPS agents in May 2012 occurred two months after the Settlement, prior to the signing of the Deed in Lieu.

Given both its express language and the circumstances surrounding its execution, the Deed in Lieu simply required the Dugos to transfer to the mortgagor good title to their Carol Stream property in exchange for a release of their obligations under their mortgage loan. *See Midland Life Ins. Co. v. Regent Partners I Gen. P'ship*, 1997 WL 361491, at *3-4 (N.D. Ill. June 20, 1997) (explaining that the Illinois Mortgage Foreclosure Law ("IMFL"), 735 ILCS 5/15-1401, provides that "[a]cceptance of a deed in lieu of foreclosure shall relieve from personal liability all persons who may owe payment or the performance of other obligations secured by the mortgage," and noting that "[t]he premise behind deeds in lieu of foreclosure is to allow a borrower to transfer title to the lender in exchange for a release of his or her obligations under the note and mortgage") (internal quotation marks omitted). Given this backdrop, the last sentence of the Deed in Lieu, which states that the Dugos "hereby release[] and waive[] all rights under and by virtue of the Homestead Exemption laws of the State of Illinois and any other State Law which may apply," evidences only the Dugos' intent to relinquish the entirety of their ownership rights in the property—rights that, as Plaintiffs point out, may have been provided by "the homestead exemption or 'other State law,' such as the Illinois divorce statute, Illinois probate act, or Illinois Rights of Married Persons Act." Doc. 129 at 9. That is the extent of the

rights that were waived. The Deed in Lieu does not extend beyond the waiver of property ownership rights to include waiving their right to challenge under the FDCPA, the ICFA, or the common law the actions that LPS agents took to secure their property in May 2012.

## III. Defendants' Motions to Strike Class Allegations

### A. LPS's Motion To Strike Classes A and C

LPS asks the court to strike the second amended complaint's allegations related to Class C, which "seeks actual and statutory damages for violations of the FDCPA against Defendant LPS for unlawful entry into Illinois homes." Doc. 93 at p. 32 (capitalization normalized). Class C is defined as:

> all State of Illinois property owners who: a) in the one year period prior to the filing of this action; b) LPS entered their property (as reflected in LPS's and/or Wells Fargo's property inspection records and/or property inspection billing records), to photograph and inventory personal property, trash out, rekey, lock-out, secure, and/or to winterize the property; and c) there was no court order granting the mortgagee the right to interfere with the homeowners' exclusive use and enjoyment of the properties.

*Id*. at ¶ 117.

To be certified, a proposed class must satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). If Rule 23(a) is satisfied, the proposed class must then fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their

interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011). The only route to class certification that Plaintiffs invoke for Class C is Rule 23(b)(3). Doc. 93 at ¶ 128. Finally, the class must be "identifiable as a class," meaning that the "class definitions must be definite enough that the class can be ascertained." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). LPS argues that the allegations related to Class C should be stricken because Plaintiffs cannot satisfy the commonality, typicality, and adequacy requirements under Rule 23(a)(2)-(4), the predominance requirement under Rule 23(b)(3), and the ascertainability requirement. Doc. 109 at 6-12.

### 1. Rule 23(a)(2): Commonality

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" and that "[t]heir claims … depend upon a common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks omitted). "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Id*. at 2556 (internal quotation marks and alterations omitted). "Rule 23(a)(2) does not demand that every member of the class have an identical claim," and some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified. *Spano*, 633 F.3d at 585; *see also Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992).

The second amended complaint alleges that the question common to proposed Class C is "whether [LPS's] practices of entering homes, photographing and inventorying their contents, trashing out, rekeying, securing, and/or winterizing homes without a hearing or court order

authorizing such practices violates the FDCPA."  Doc. 93 at ¶ 125(b).  While it is true that there may be factual variation between class members concerning which of these "practices" apply to them, these variations do not necessarily defeat commonality on the pleadings.  The court can envision multiple groupings of these practices that could state an FDCPA claim, consisting of as many as all of them to as few as just one practice, such as rekeying a home.

LPS argues that no commonality exists where there is a "lack of common issues between even the Hills' individual claim and the Dugos' individual claim …[,] much less the claims of each putative member of Class C."  Doc. 109 at 7.  LPS explains that "[t]he Hills[], for example, *do* allege that [LPS] 'entered' their home and 'took pictures of the home and inventoried its contents' …, but *do not* allege that [LPS] 'trashed out, rekeyed, secured or winterized' their home" within the relevant limitations period; by contrast, "[t]he Dugos *do* allege that [LPS] changed the locks on their front door and turned off the water valve on their hot water tank …, but *do not* allege that [LPS] photographed or inventoried the contents of their home."  *Ibid*.  "The difference between these allegations is material," LPS contends, "because the Hills' allegations do not support a claim under Section 1692f(6)."  *Ibid*.  This is incorrect, as the court held above that the Hills have stated an FDCPA claim on the bases of LPS agents' various actions.  At the pleading stage, the court cannot foreclose the possibility that a common question (whether LPS's involvement in one or more of the aforementioned practices violates the FDCPA) could yield a common answer ("yes" or "no"), even granting some factual variation among the putative class members.  The issue is likely to be crystalized on the more complete record that will be present when Plaintiffs move for class certification.

## 2. Rule 23(a)(3): Typicality

The typicality requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chi. Police Ass'n*, 7 F.3d at 597 (internal quotation marks omitted). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (internal quotation marks omitted).

LPS argues that "[t]he proposed definition for Class C … fails to satisfy Rule 23(a)(3) because it includes borrowers who do not possess any claim at all," in reference to the Hills, "whose property was merely photographed and inventoried—actions that do not even suggest dispossession or disablement of property." Doc. 109 at 12. This argument fails because, as held above, the Hills state an FDCPA claim by alleging that their home was broken into and its contents photographed and inventoried even though LPS knew their home was still occupied.

The Hills' and Dugos' FDCPA claims arise from a combination of the following "practices" by LPS: "entering homes, photographing and inventorying their contents, trashing out, rekeying, securing, and/or winterizing homes without a hearing or court order authorizing such practices violates the FDCPA." Doc. 93 at ¶ 125(b). The Hills allege that LPS agents entered their home and photographed and inventoried its contents with the knowledge that the home was occupied, while the Dugos allege that LPS agents rekeyed their front door and turned off their hot water valve. Because there is likely to be overlap between those claims and the claims of the class at large, the court cannot definitively hold on the pleadings that the typicality requirement cannot possibly be met.

### 3.    Rule 23(a)(4): Adequacy

The Rule 23(a)(4) adequacy inquiry "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).  LPS challenges only the adequacy of the Hills and the Dugos as representatives of Class C.  A named plaintiff is inadequate if his interests are "antagonistic or conflicting" with those of the absent class members, *Rosario*, 963 F.2d at 1018, or if he is subject to a defense not applicable to the class as a whole, *see CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011); *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011).

LPS's sole argument is that Plaintiffs "cannot adequately represent the putative members [of] Class C because the focus of the litigation will be on defenses that are unique to each of their individual claims."  Doc. 109 at 13.  It notes that "a 'major focus' of this lawsuit has already been centered on defenses that are unique to the Hills and Dugos," citing its motion seeking dismissal of the Hills' FDCPA claim and comparing it to its motion to strike certain allegations from the Dugos' FDCPA claim.  Doc. 143 at 12.  But LPS does not provide any elaboration on how Plaintiffs' arguments opposing the motion to dismiss or strike constitute "unique" defenses that could become the focus of a class lawsuit.

### 4.    Rule 23(b)(3): Predominance and Superiority

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As the Seventh Circuit has explained:

> Rule 23(b)(3)'s predominance requirement is satisfied when common
> questions represent a significant aspect of a case and … can be resolved for all
> members of a class in a single adjudication. Or, to put it another way,
> common questions can predominate if a common nucleus of operative facts
> and issues underlies the claims brought by the proposed class. If, to make a
> prima facie showing on a given question, the members of a proposed class
> will need to present evidence that varies from member to member, then it is an
> individual question. If the same evidence will suffice for each member to
> make a prima facie showing, then it becomes a common question. Individual
> questions need not be absent. The text of Rule 23(b)(3) itself contemplates
> that such individual questions will be present. The rule requires only that
> those questions not predominate over the common questions affecting the
> class as a whole.

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (citations,
brackets, and internal quotation marks omitted). "Analysis of predominance under Rule 23(b)(3)
'begins, of course, with the elements of the underlying cause of action.'" *Ibid.* (quoting *Erica P.
John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011)). An FDCPA violation under
§ 1692f(6) occurs where the debt collector (LPS) takes or threatens to take "any nonjudicial
action to effect dispossession or disablement" of property within the one-year limitations period.
15 U.S.C. § 1692f(6).

Again, the second amended complaint alleges that the question of law and fact common
to proposed Class C is "whether [LPS's] practices of entering homes, photographing and
inventorying their contents, trashing out, rekeying, securing, and/or winterizing homes without a
hearing or court order authorizing such practices violates the FDCPA." Doc. 93 at ¶ 125(b). It
cannot be said at the pleading stage that alleging non-overlapping combinations of practices
preclude the possibility that a certain combination can predominate. *See Butler v. Sears,
Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("common issues need only predominate, not
outnumber individual issues") (internal quotation marks omitted); *Messner*, 669 F.3d at 815
("Individual questions need not be absent. … [Rule 23(b)(3)] requires only that those questions

not predominate over the common questions affecting the class as a whole.").  Because

additional discovery may uncover the practice or group of practices comprising the "common

nucleus of operative facts and issues … that underlies the [FDCPA] claim[] brought by the

proposed class," the court will not strike Class C.  *Messner*, 669 F.3d at 815 (internal quotation

marks omitted); *see also Damasco v. Clearwire Corp*, 662 F.3d 891, 897 (7th Cir. 2011)

("Although discovery may in some cases be unnecessary to resolve class issues, in other cases a

court may abuse its discretion by not allowing for appropriate discovery before deciding whether

to certify a class.") (citation omitted); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935,

942 (9th Cir. 2009) ("we have stated that the propriety of a class action cannot be determined in

some cases without discovery, and that the better and more advisable practice for a District Court

to follow is to afford the litigants an opportunity to present evidence as to whether a class action

was maintainable") (citations, brackets, and internal quotation marks omitted).

 LPS contends that "the second amended complaint makes clear that each member of the

proposed class, including [Plaintiffs], will need to present varying evidence in order to establish

that actions taken by [LPS] dispossessed them from their property or disabled it."  Doc. 109 at 8.

LPS tries to draw a parallel to the ICFA class stricken by the court's prior opinion.  The amended

complaint's class allegations purported to ask the common questions of whether Defendants'

attempts at "prejudgment dispossession constitute[] unfair business practices and unlawful

trespass" and whether their practices of "boarding up, changing locks, and entering into homes

without [a] hearing or a court order violates statutory and common law."  946 F. Supp. 2d at 831

(second alteration in original).  In holding that the class could not proceed, the court reasoned:

> These questions cannot predominate [under Rule 23(b)(3)] because the
> lawsuit presents a slew of legal and factual questions that are unique to each
> class member.  With respect to each class member the following questions are
> presented: What actions did Defendants take against that particular class

> member?  Did they change his locks, board up his doors or windows, or do
> something else like vandalizing his hot water tank, or did they merely enter
> his home without doing anything in particular inside it, or merely trespass on
> his land without entering any structure?  When did each act take place, and
> which occurred within the applicable statute of limitations?  Do the particular
> actions amount to an attempt to drive the class member out of his home (as
> was the case with the Hills), or do they in some other way constitute unfair
> practices under the ICFA?  Did Defendants have a court order entitling them
> to dispossess the class member?

*Id*. at 832.  By contrast, the second amended complaint's allegations related to Class C specify

that the class is limited to those bringing a FDCPA claim based on having been subjected to

LPS's practices which were executed without a court order and within the one-year statute of

limitations period.  Doc. 93 at ¶ 117.  Contrary to LPS's suggestion, it is not inconceivable for

Class C to encompass largely individuals whose homes have been entered, photographed and

inventoried, trashed out, rekeyed, secured, and winterized, or a combination thereof, and who,

based on those actions, may state an FDCPA claim.  Thus, it would be premature to strike

allegations for failure to satisfy the predominance requirement.

Rule 23(b)(3) lists the following factors as pertinent to superiority: "(A) the class

members' interests in individually controlling the prosecution or defense of separate actions; (B)

the extent and nature of any litigation concerning the controversy already begun by or against

class members; (C) the desirability or undesirability of concentrating the litigation of the claims

in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ.

P. 23(b)(3).  LPS's argument against superiority turns on its view that "[t]he predominance of

individual issues concerning the claim of each putative member of Class C and their need to

present unique and personal evidence to establish whether [LPS] took actions against them to

'effect dispossession or disablement' of their property demonstrates that no economies of any

kind would be achieved through class adjudication."  Doc. 109 at 9.  This argument fails

because, as just discussed, common questions may in fact predominate, thereby promoting judicial economy by resolving the same issues in one case.

### 5.    Definiteness and Ascertainability

As noted above, a class definition "must be definite enough that the class can be ascertained." *Oshana*, 472 F.3d at 513; *see also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495-97 (7th Cir. 2012). "An identifiable class exists if its members can be ascertained by reference to objective criteria." Federal Judicial Center, *Manual for Complex Litigation* § 21.222, at 270 (4th ed. 2004); *see also Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008) ("a class is sufficiently definite if its members can be ascertained by reference to objective criteria and may be defined by reference to defendants' conduct"). Moreover, "[a]lthough the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable" because "individual class members must receive the best notice practicable and have an opportunity to opt out." *Manual for Complex Litigation*, *supra*, § 21.222, at 270 (class definition "must be precise, objective, and presently ascertainable"); *see also Adashunas v. Negley*, 626 F.2d 600, 603-04 (7th Cir. 1980).

LPS argues that membership in Class C is not ascertainable because "arduous individual inquir[ies]" would be "necessary to determine if [LPS] took nonjudicial actions to effect dispossession or disablement of property belonging to each putative class member." Doc. 109 at 10. In response, Plaintiffs state that whether "LPS entered [class members'] property and re-keyed (changed) the locks, photographed and inventoried personal property, trashed out the home or winterized it" can be determined from a "ministerial review" of LPS's property inspection records and related billing records, and that whether a court order was obtained can be likewise easily verified by Wells Fargo's foreclosure files. Doc. 122 at 8-9. The court cannot

say on the pleadings that Plaintiffs are incorrect, so ascertainability is not defeated at this stage. *See Wooley v. Jackson Hewitt Inc.*, 2011 WL 1559330, at *2 (N.D. Ill. Apr. 25, 2011) (holding that a class is ascertainable "if a clear and accessible paper or electronic record revealed whether a customer provided incorrect information or whether, by contrast, the tax preparer botched the return … despite having been provided accurate information").

LPS next argues that "[t]he proposed definition for Class C … remains an impermissible 'fail-safe' class because membership in the class can only be determined after a decision on the merits of a person's claim is rendered." Doc. 109 at 10-11. But as Plaintiffs correctly point out, "membership in <u>Class C</u> does not require the Court to first make a legal determination about the merit of class members' claims," and "[i]nstead, class membership turns on objective facts, namely, whether the person had a property in Illinois, with a Wells Fargo loan that went into foreclosure, and suffered a break in by LPS for a lock change, inventory, trash out <u>or</u> winterization according to LPS's records, even though there was no court order awarding Wells Fargo possession." Doc. 122 at 9.

LPS attempts to draw support from *Adashunas*, where the Seventh Circuit held that a proposed class consisting of "children entitled to a public education who have learning disabilities and who are not properly identified and/or who are not receiving special education" was "so highly diverse and so difficult to identify that it is not adequately defined or nearly ascertainable." 626 F.2d at 603-04 (internal quotation marks omitted); *see* Doc. 109 at 10-11. The Seventh Circuit added that "[t]he new class definition, if allowed, would result in a 'fail-safe' class, a class which would be bound only by a judgment favorable to plaintiffs but not by an adverse judgment." *Adashunas*, 626 F.2d at 604 (internal quotation marks omitted). *Adashunas* is distinguishable because, unlike the "long, arduous process" for identifying the

"widely diverse" symptoms of children with disabilities, the process for identifying members of Class C consists of a straightforward scan of LPS's and Wells Fargo's records for a finite list of actions performed by LPS and for evidence of a court order, respectively.

* * *

The second amended complaint defines proposed Class A as follows:

> all State of Illinois property owners who: a) in the one year period prior to the filing of this action; b) had their property inspected (as reflected by LPS's and/or Wells Fargo's and/or their agents' property inspection billing records); and c) LPS posted the [vacancy] notice [described] above, having 'found' the property to be 'vacant/abandoned' (as reflected in LPS's and/or Wells Fargo's and/or their agents' property inspection billing records); and d) there was no court order granting the mortgagee any right to enter the property, much less to enter upon and affix to the property such notice (effectively dispossessing homeowners of their property interests by interfering with the exclusive use and enjoyment of possession of the property and depriving homeowners of the safe and secure use of the property.)

Doc. 93 at ¶ 109. The class "seeks statutory damages for violations of the FDCPA against Defendant LPS for its use of a form notice that unlawfully threatens disablement/dispossession of property." *Id*. at p. 30 (capitalization normalized).

LPS argues that the court should "strike the allegations relating to Class A because the underlying conduct upon which the class definition rests—the posting of a vacancy notice—is not actionable under Section 1692f(6) of the FDCPA," and "the language of [LPS]'s postings has not changed since the Court issued [its earlier] ruling." Doc. 109 at 5. LPS's argument cannot be squared with *Schleicher v. Wendt*, 618 F.3d 679 (7th Cir. 2010), which held that "[t]he chance, even the certainty, that a class will lose on the merits does not prevent its certification." *Id*. at 687. Moreover, the second amended complaint's more detailed FDCPA claim, which survives dismissal, counsels against striking Class A under Rule 12(f). LPS may renew its argument, on a more complete record, if Plaintiffs proceed to move for certification of Class A.

## B.  Defendants' Motion To Strike Classes B and D

Class D "seeks injunctive and/or declaratory relief under the ICFA against LPS and

Wells Fargo to stop their practice of entering Illinois homes without a court order."  Doc. 93 at p.

33 (capitalization normalized).  Class D is defined as follows:

> all State of Illinois property owners who: a) in the three year period prior to
> the filing of this action; b) LPS entered their properties (as reflected by LPS's
> and/or Wells Fargo's property inspection records and/or property inspection
> billing records) to gain entry, photograph and inventory personal property
> contents, break in, trash out, rekey, lock-out, secure, and/or to winterize the
> property; and c) there was no court order granting the mortgagee the right to
> interfere with the homeowners' exclusive use and enjoyment of the properties.

*Id*. at ¶ 119.  The second amended complaint alleges that "[b]ecause Defendants' entries into

Plaintiffs' and the class members' homes to gain entry, photograph and inventory personal

property contents, break in, trash out, rekey, lock-out, secure, and/or to winterize the property are

prohibited under Illinois law (specifically, the IMFL which requires a court order for such entry),

such conduct violates the ICFA."  *Id*. at ¶ 120.  In moving to strike Class D, Defendants

challenge the appropriateness of injunctive relief under Rule 23(b)(2) and Plaintiffs' ability to

satisfy the Rule 23(a)(2)-(4) requirements of numerosity, commonality, typicality, and adequacy,

as well as the requirement of ascertainability.  Doc. 107.

### 1.  Rule 23(b)(2): Injunctive Relief

Rule 23(b)(2) provides that class certification is available if "the party opposing the class

has acted or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R.

Civ. P. 23(b)(2).  "Subsumed in this rule are at least two independent requirements: The

contemplated equitable relief must be (1) 'appropriate respecting the class as a whole' and (2)

'final.'" *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011).

Plaintiffs contend that "Defendants acted on grounds applicable to the class as a whole because, by the definition of that class, they broke into and effected a lock change, inventory, trash out or winterization on the home of every member," thereby making "an injunction barring this conduct … appropriate." Doc. 129 at 25. Defendants counter that injunctive relief is inappropriate because "the *entire complaint* is based only on allegations of *past acts* with no well-pled facts that the activities are likely to occur in the future." Doc. 144 at 8.

Defendants correctly assert that "the Dugos have *no right* to injunctive relief because they have already conveyed away all of their rights to the Dugo Property by executing the Deed in Lieu." *Ibid*. On September 7, 2012, the Dugos transferred their entire interest in their Carol Stream property to U.S. Bank and its successors and assigns in exchange for a release from their mortgage loan obligations. Doc. 107-1 at 61. Because the Dugos no longer own their home, they would have nothing to gain from an injunction barring Defendants from entering that property. Thus, the Dugos may not serve as class representatives of proposed Class D, which "exclusively seek[s] injunctive relief." Doc. 129 at 26; *see Kartman*, 634 F.3d at 893; *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 978 (5th Cir. 2000) (holding that injunctive relief is inappropriate where the plaintiffs "have nothing to gain from an injunction, and the declaratory relief they seek serves only to facilitate the award of damages").

Regarding the Hills, Defendants argue that injunctive relief is inappropriate because "the most recent alleged conduct taken against the Hill Property occurred in May of 2012 … and the [second amended complaint] contains no well-pled facts that the activities are likely to occur in the future." Doc. 144 at 8-9. Contrary to Defendants' suggestion, the second amended complaint alleges that "[t]o date, as is the standard practice and procedure in Illinois, LPS

continues to send out its agents to case the Hills' home, even during the pendency of this suit."

Doc. 93 at ¶ 93. Injunctive relief may therefore be appropriate for the Hills and members of

proposed Class D who are currently being subjected to unauthorized entrances, lock changes,

inventories, trash outs, or winterizations.

### 2. Rule 23(a)(1): Numerosity

A plaintiff need not plead or prove the exact number of class members to establish

numerosity under Rule 23(a)(1), and the court "is entitled to make common sense assumptions in

order to support a finding of numerosity." *Peterson v. H & R Block Tax Servs.*, Inc., 174 F.R.D.

78, 81 (N.D. Ill. 1997) (internal quotation marks omitted). However, "the party supporting the

class cannot rely on mere speculation or conclusory allegations as to the size of the putative class

… for numerosity purposes." *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) (internal

quotation marks omitted); *see also Roman v. First Franklin Fin. Corp.*, 2001 WL 322563, at *2

(N.D. Ill. Mar.3, 2001) ("the impracticability of joinder must be positively shown and not merely

speculative").

Plaintiffs contend that they "will have no difficulty proving numerosity at the class

certification stage because it was Defendants' regular practice to post LPS's illegal 'vacancy'

notice, and break into homes to effect a lock change, inventory the property, trash out or

winterization, without a court order." Doc. 129 at 18. In an effort to demonstrate that there will

be no shortage of class members, Plaintiffs note that Wells Fargo has foreclosed on nearly 1,200

Illinois properties, and LPS even has a "Frequently Asked Question" page on their website for

property owners subjected to lock changes. Doc. 129 at 18 & n.9. Defendants maintain that

"[t]here are still no factual allegations to suggest the size of the Putative Class members." Doc.

144 at 18. While it is true that Plaintiffs are currently unable to identify a ballpark number of

members in Class D, it is not necessary for them to do so in order to survive a Rule 12(f) motion. Plaintiffs have made allegations plausibly suggesting that there will be a sizable membership. It would be inappropriate for the court on the pleadings to strike class allegations for failure to satisfy the numerosity requirement.

### 3.     Rule 23(a)(2): Commonality

The second amended complaint alleges that the question common to proposed Class D is "whether Defendants' practices of entering homes, photographing and inventorying their contents, trashing out, rekeying, securing, and/or winterizing homes without a hearing or court order authorizing such practices violates the … ICFA." Doc. 93 at ¶ 125(b). Defendants argue that "the [second amended complaint] proves that adjudicating the claims of an entire putative class will not involve *any* common issues affecting liability or damages because even the actions purportedly taken against the named plaintiffs and their alleged damages are distinct." Doc. 107 at 13-14. They note that while "the [second amended complaint] alleges multiple entries into the Hill Property, that the gas valve was turned off and toilet winterized, and the Hills' personal property was 'rifled through' and personal property such as 'tools' was missing," the "Dugos allege only a single entry and single notice posting on the Dugo Property and purported water damage to the Dugos' 'floor tile.'" *Id.* at 14. Moreover, unlike the Hills, the Dugos had signed a deed in lieu of foreclosure. *Ibid.* The comparison of the Hills and Dugos alone, Defendants argue, "epitomizes how adjudication of this action on a class basis is impossible, as it would require an individual inquiry into each purported class member's circumstances." *Ibid.*

Defendants' reliance on the differences between the Hills and Dugos is mooted by the court's holding that the Dugos cannot be part of Class D. And the court is not persuaded by Defendants' argument that "there are no common questions capable of class wide resolution in

one stroke." Doc. 144 at 11 (internal quotation marks omitted). Class D poses the common question of "whether LPS's practice of breaking into Illinois homes in foreclosure without a court order to (a) change the locks, (b) inventory the home's contents, (c) trash it out, or (d) winterize it, constitutes an unfair practice under the ICFA." Doc. 129 at 19-20. At the pleading stage, the court cannot say that it is inconceivable for members of Class D to have been subjected to an overlapping set of practices that would support an ICFA unfairness claim. For example, there may be a class comprised of individuals like the Hills whose homes were entered by Defendants in order to change the locks, inventory the contents, and winterize the property.

Defendants acknowledge that Rule 23(a)(2) does not require the absence of factual variation, but they contend that "such variations preclude commonality where—as in the [second amended complaint]—there are *no factual allegations* regarding any of the other Putative Class members." Doc. 144 at 12. The case they cite, *Patterson v. General Motors Corp.*, 631 F.2d 476 (7th Cir. 1980), is distinguishable. In *Patterson*, the proposed class was comprised of minority employees of General Motors who were "affected by the practices complained of herein," which consisted of discriminatory practices specific to the plaintiff. *Id*. at 478-79. In holding that the plaintiff could not satisfy the commonality requirement, the Seventh Circuit noted that the plaintiff "has not indicated that any other employee has ever been discriminated against in the same way or that there is the likelihood of such a future class ever existing." *Id*. at 480. By contrast, Plaintiffs here assert that they "will have no difficulty proving numerosity at the class certification stage because it was Defendants' regular practice to post LPS's illegal 'vacancy' notice, and break into homes to effect a lock change, inventory the property, trash out or winterization, without a court order." Doc. 129 at 18. It would be premature for the court to strike class allegations on the pleadings without affording Plaintiffs the opportunity to identify

individuals who have been subjected to a common set of practices that state an ICFA unfairness claim.

### 4. Rule 23(a)(3): Typicality

The Dugos' dismissal as class representatives leaves the Hills as the only named representatives of Class D. In arguing that "no other putative class member can allege that their claims arise from the alleged entries and securing of [Hill's property]," Defendants overlook the fact that typicality may also be satisfied where a plaintiff's claim arises from the same "practice or course of conduct that gives rise to the claims of other class members"—and not just from the same event. *De La Fuente*, 713 F.2d at 232 (internal quotation marks omitted). As mentioned above, it is certainly possible that the Hills were subjected to the same set of practices as other class members, and that these practices state ICFA unfairness claims.

### 5. Rule 23(a)(4): Adequacy

Defendants' sole challenge to Plaintiffs' ability to satisfy the adequacy requirement is that "[t]he Hills and Dugos will have to expend resources to litigate the issues that are individual to them, which will significantly 'usurp' the time and energy of the Hills, Dugos and their counsel to the detriment of the absent class members." Doc. 144 at 17. Defendants note that Class D would "be subject to defenses unique to each named Plaintiff," as the Dugos, unlike the Hills, signed a release in the form of the Deed in Lieu. Doc. 107 at 25. These arguments are mooted by the court's dismissal of the Dugos from Class D. And there is no reason on the pleadings to believe that the Hills would be incapable of adequately representing Class D.

### 6. Definiteness and Ascertainability

Defendants argue that "[t]here is no objective criteria through which the Court could ascertain [proposed Class D]," as "the Court would be required to engage in numerous

individualized inquiries to determine …whether the putative class members' properties were 'entered' 'to gain entry, photograph and inventory personal property contents, break in, trash out, rekey, lockout, secure, and/or to winterize the property' … and … the *non*-existence of an order from any court granting the 'mortgagee the right to enter the property."  Doc. 107 at 22. Plaintiffs respond that an examination of Defendants' property inspection records and related billing records will easily reveal the Illinois homeowners "to which the following verifiable facts occurred: (a) LPS entered their property to re-key (change) the locks, photograph and inventory personal property, trash out the home or winterize it," and that foreclosure files kept by Wells Fargo would show whether Wells Fargo obtained the relevant court orders.  Doc. 129 at 16.  This inquiry is identical to that required to ascertain the membership of Class C, and suffices to defeat a motion to strike class allegations for the same reasons discussed above.

Defendants next argue that "the class definition is overly broad because it is not sufficiently connected to the ICFA claim," noting that Class D includes individuals "whose homes were only 'inspected' or 'entered.'"  Doc. 107 at 23.  As the court has already explained, it is conceivable that a combination of practices listed would support an ICFA unfairness claim, and it would be premature to strike class allegations before affording Plaintiffs the opportunity for discovery.

Finally, Defendants argue that the second amended complaint "pleads an impermissible 'fail-safe' class because a decision on the merits of a person's claim is needed to determine whether a person is a member of a class."  Doc. 107 at 23 (internal quotation marks omitted). They contend that "the Court would have to conduct full-blown trials into each putative class member's individual circumstances to resolve, for example, whether the individual was dispossessed, o[r] subject to threats of dispossession or disablement, of their home."  *Id*. at 24.

However, as Plaintiffs have repeatedly pointed out, membership in Class D "turns on objective facts, namely, whether the person had an Illinois property in foreclosure with Wells Fargo, whether LPS … broke into the property to effect a lock change, inventory, trash out or winterization according to Defendants' records …, and whether Wells Fargo's and its lawyers' foreclosure files contain a court order granting Wells possession of the property." Doc. 129 at 17-18. No "full-blown trial" is necessary because these facts are likely to be readily ascertainable from Defendants' records.

\* \* \*

The second amended complaint defines proposed Class B as follows:

> all State of Illinois property owners who: a) in the three year period prior to the filing of this action; b) had their property inspected (as reflected by LPS's and/or Wells Fargo's and/or their agents' property inspection billing records); and c) LPS posted the [form vacancy] notice … having 'found' the property to be 'vacant/abandoned' (as reflected in LPS's and/or Wells Fargo's and/or their agents' property inspection billing records) and d) there was no court order granting the mortgagee the right to enter the property, much less the right to enter upon and affix to the property such notice ….

Doc. 93 at ¶ 111. The class seeks injunctive relief for "violations of the ICFA against Defendants LPS and Wells Fargo for the use of a form notice that threatens dispossession." *Id.* at p. 31 (capitalization normalized). The class proceeds under the theory that, "[b]ecause the form language of the notice … falsely threatens imminent nonjudicial action to effect dispossession and/or disablement of property (*i.e.* to secure or winterize the property) and/or deceptively seeks to impose upon the homeowner an obligation to call as the sole means to avoid such imminent dispossession and/or disablement, when no such obligation exists, and because such actions of dispossession and/or disablement cannot legally be taken …, the notice violates the ICFA." *Id.* at ¶ 113.

Defendants argue that "the [second amended complaint] wholly fails to correct the defects that the Court already held are fatal to this action proceeding on a class basis."  Doc. 107 at 7.  As with their attack on Class A, Defendants' argument cannot be squared with *Schleicher*, which held that "[t]he chance, even the certainty, that a class will lose on the merits does not prevent its certification."  618 F.3d at 687.  As with Class A, Defendants may renew their argument, on a more complete record, if Plaintiffs seek certification of Class B.

## Conclusion

For the foregoing reasons, Defendants' motions are denied, with the following exceptions: sub-classes B and D are stricken, and the Dugos may not proceed as class representatives for Class D.

January 16, 2015

_____
United States District Judge